Present:   All the Justices

BOBBY WAYNE SWISHER
                         OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record Nos. 980677 & 980678      November 6, 1998

COMMONWEALTH OF VIRGINIA

           FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                      Thomas H. Wood, Judge

     In these appeals, we review the capital murder
conviction, sentence of death, and related convictions imposed
upon Bobby Wayne Swisher.

                        I.   PROCEEDINGS

     On April 28, 1997, an Augusta County grand jury indicted
Swisher for the following offenses:  capital murder of Dawn
McNees Snyder in the commission of abduction with the intent
to defile the victim of such abduction or in the commission of
or subsequent to rape or forcible sodomy in violation of Code
§ 18.2-31; abduction with intent to defile Snyder in violation
of Code § 18.2-48; rape of Snyder in violation of Code § 18.2-
61; and forcible sodomy of Snyder in violation of Code § 18.2-
67.1.

     Swisher was tried before a jury and found guilty of the
charged offenses.  The jury fixed Swisher's punishment at life
imprisonment for the abduction with intent to defile
conviction, life imprisonment for the rape conviction, and
life imprisonment for the forcible sodomy conviction.  In the

penalty phase of the capital murder trial, the jury fixed Swisher's punishment at death, finding that he represented a continuing serious threat to society and that his offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim.  After considering a report prepared by a probation officer pursuant to Code § 19.2-264.5, the trial court sentenced Swisher in accord with the jury verdicts.

We have consolidated the automatic review of Swisher's death sentence with his appeal of the capital murder conviction.  Former Code § 17-110.1(F).[*]  Swisher's appeal of his non-capital convictions was certified from the Court of Appeals, former Code § 17-116.06, and was consolidated with his capital murder appeal and given priority on our docket.

## II.  THE EVIDENCE

On February 5, 1997, Dawn McNees Snyder disappeared from a florist shop where she worked in Stuarts Draft in Augusta County.  Her body was found on February 21, 1997, near a riverbank about two miles from the florist shop.  Animals had eaten extensive portions of her face, neck, and upper chest, and her identity was established by use of her dental records.

---

[*] Effective October 1, 1998, Title 17 was superseded by Title 17.1.  As this appeal was briefed and argued prior to the effective date of Code § 17.1-313, our review was

2

On February 22, 1997, the defendant, age 20, was at an apartment with two friends, one of whom was Clarence Henry Ridgeway, Jr. Swisher told Ridgeway that Swisher had abducted, raped, sodomized, and killed Snyder. Swisher stated: "You know the woman, Dawn Snyder . . . I killed her." Swisher related the following details to Ridgeway.

On February 5, 1997, about 7:15 p.m., Swisher's uncle drove Swisher by car to a grocery store located near the florist shop where Snyder worked. Swisher left the grocery store and walked to the florist shop. Swisher entered the shop, approached Snyder, and said, "I have a gun in my pocket." Swisher showed Snyder a "butcher knife with ridges" and directed her to go with him.

Swisher forced Snyder to leave the florist shop through a rear door, and they walked for some distance until they reached a field by the South River. Then, Swisher stopped Snyder and told her to "suck his dick." He forced her to perform an act of oral sodomy upon him, and he made her remove her clothes. After he raped her, she put her clothes on, and he forced her to perform another act of oral sodomy upon him.

Swisher decided to kill Snyder because she had "seen his face." He "pulled out the butcher knife" that had "ridges

conducted pursuant to otherwise identical provisions of the formerly applicable Code sections.

around the edge of the blade," and he "slit her across the left side of the face and was holding her; then slit her throat and then gouged her and then tossed her into a river." He walked along the riverbank, watching her in the river, asking her, "[a]re -- are you dead yet?" After Snyder floated in the river for awhile, Swisher saw her "crawl up the bank." Then, "he got scared and took off running straight to his house from that field." Swisher threw his knife in the river.

When Swisher finished his confession to Ridgeway, Swisher stated that "[i]t feels like [I] could do it again." The following morning, Ridgeway informed the Augusta County Sheriff's Office of Swisher's crimes.

On February 23, 1997, Sergeant William E. Lemerise, Sergeant K.W. Reed, and two other deputies went to a house where Swisher resided with his uncles, Paul H. Swisher and William E. Swisher. Sergeant Reed advised Bobby Swisher that he was a suspect in the murder of Dawn Snyder and asked if Swisher would accompany the deputies to the Sheriff's Office for questioning. Swisher, who did not object, accompanied the deputies. Sergeant Lemerise informed Swisher that he would be required to wear handcuffs while en route to the Sheriff's Office because of a departmental policy which required that the sheriff's personnel transport suspects in restraints for safety considerations. Lemerise told Swisher that he would

have to wear these restraints even though he was not under arrest.

When Swisher arrived at the Sheriff's Office, about 10:15 p.m., the handcuffs were immediately removed from him, and he was taken to a "briefing room." The briefing room is an open room with a coffee machine and a drink machine. There are no bars on the windows or door locks in that room. Swisher was permitted to smoke cigarettes, and he was given coffee.

Sergeant Lemerise explained to Swisher that he was not under arrest, that he was a suspect, that the sheriff's personnel were going to ask him some questions, and that he was free to leave. Lemerise asked Swisher "how did he feel about the fact that he could walk out of there if he chose to, words to that effect . . . and [Swisher] appeared at that point in time, although he was nervous . . . to be fine with the situation."

Swisher spoke with the deputies, but did not confess to the commission of any crimes until after he was arrested and twice read his Miranda rights after midnight on February 24. Swisher admitted, in an audiotaped confession, that he had sodomized, raped, and murdered Snyder by cutting her throat. He also stated that after he cut her throat, he threw her into the South River.

Dr. David Oxley, a medical examiner who performed an autopsy on Snyder's body, was unable to render an opinion about the specific cause of Snyder's death. He did state, however, that it was an inescapable conclusion that Snyder's death was the result of violent causes "probably related to the neck." Dr. Oxley was not able to determine positively whether the victim's throat had been cut because animals had eaten her larynx, trachea, and the large arteries and veins that were in her neck. The highest concentration of blood on the victim's clothing appeared on a shirt around the neck area extending onto the chest area.

Patricia Taylor, a forensic scientist in the Forensic Biology Unit of the Western Regional Laboratory for the Commonwealth of Virginia, qualified as an expert witness on the subject of forensic DNA (deoxyribonucleic acid). She examined some panties that were found on Snyder's body. Her examination revealed that DNA consistent with Swisher's DNA was found in semen deposited on Snyder's panties. Taylor testified that the odds of the DNA found on Snyder's panties belonging to someone other than Swisher were one in 380,000,000 in the Caucasian population.

Spots of blood were found on Swisher's coat. Taylor testified that the DNA profile obtained from that coat is consistent with the DNA profile of Snyder and different from

the DNA profile of Swisher. Taylor testified that the probability of randomly selecting an individual unrelated to Snyder who had a DNA profile consistent with the DNA on Swisher's coat was approximately one in 1.3 billion in the Caucasian population. Dr. Taylor testified that the DNA profile obtained from spermatozoa heads extracted from the victim's stomach and esophagus were consistent with Swisher's DNA profile.

### III. ASSIGNMENT OF ERROR PROCEDURALLY DEFAULTED

Swisher argues that the trial court erred in denying his motion to "declare the Virginia capital murder and death penalty statutes unconstitutional and to prohibit the imposition of the death penalty." Swisher claims that Virginia's death penalty statutes, "specifically . . . Code §§ 19.2-2[6]4.2 through 19.2-264.5, [and former Code §§ 17-110.1 and 17-110.2] . . . on their face and as applied, violate the Eighth Amendment prohibition against cruel and unusual punishment, the Sixth Amendment guarantee to a fair trial, and the Fourteenth Amendment guarantee that no person shall be deprived of life, liberty, or property without due process of law." In support of his contentions, Swisher merely refers this Court to a memorandum of law that he filed in the trial court.

7

We hold that Swisher's assertions are insufficient and constitute a procedural default. "An appellant who asserts that a trial court's ruling was erroneous has an obligation to state clearly to the appellate court the grounds for that assertion. A cross-reference to arguments made at trial is insufficient." Spencer v. Commonwealth, 240 Va. 78, 99, 393 S.E.2d 609, 622, cert. denied, 498 U.S. 908 (1990); Jenkins v. Commonwealth, 244 Va. 445, 460-61, 423 S.E.2d 360, 370 (1992), cert. denied, 507 U.S. 1036 (1993).

## IV. ISSUES PREVIOUSLY DECIDED

Swisher raised certain issues on appeal which have been decided adversely to his claims by our previous decisions. We adhere to those rulings, and we will not discuss them further. The issues previously resolved are:

(1) Whether the defendant should have been granted additional preemptory challenges. See Strickler v. Commonwealth, 241 Va. 482, 489, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944 (1991); Quesinberry v. Commonwealth, 241 Va. 364, 371, 402 S.E.2d 218, 223 (1991), cert. denied, 502 U.S. 834 (1991); Spencer, 240 Va. at 84-85, 393 S.E.2d at 613; Buchanan v. Commonwealth, 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), cert. denied, 493 U.S. 1063 (1990).

(2) Whether the trial court erred in denying the defendant's request to mail a questionnaire to the potential

8

jury venire.  See Goins v. Commonwealth, 251 Va. 442, 454, 470

S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996); Strickler,

241 Va. at 489-90, 404 S.E.2d at 232.

V.  BILL OF PARTICULARS

Swisher filed a motion for a bill of particulars,

requesting that the trial court enter an order requiring the

Commonwealth:

> "a)  To identify the grounds, and all of them, on
> which it contends that defendant is guilty of
> Capital Murder under . . . Code § 18.2-31.
>
> "b)  To identify the evidence, and all of it, upon
> which it intends to rely in seeking a conviction of
> Defendant upon the charge of Capital Murder.
>
> "c)  To identify the aggravating factors, if any,
> upon which it intends to rely in seeking the death
> penalty, should defendant be convicted of Capital
> Murder.  Additionally:
>
>> "1)  If the Commonwealth intends to prove
>> 'vileness' as an aggravating factor, as set out
>> in . . . Code . . . § 19.2-264.4C, to identify
>> as many of the components of the factor,
>> including torture, depravity of mind, and
>> aggravated battery, on which it intends to
>> offer evidence.
>>
>> "2)  If the Commonwealth intends to prove
>> 'vileness' as an aggravating factor,  as set
>> out in . . . Code . . . § 19.2-264.4C, to
>> further identify every narrowing construction
>> of that factor on which it intends to offer
>> evidence.
>>
>> "3)  If the Commonwealth intends to prove
>> 'future dangerousness' as an aggravating
>> factor, as set out in . . . Code . . . § 19.2-
>> 264.4C and pursuant to . . . Code . . . § 19.2-
>> 264.3:2, to identify any unadjudicated

9

allegations of misconduct by defendant upon which it intends to offer evidence and any circumstances of the offense it contends are relevant to proof of the factor.

"4) If the Commonwealth intends to prove 'future dangerousness' as an aggravating factor, as set out in . . . Code . . . § 19.2-264.4C and pursuant to . . . Code . . . § 19.2-264.3:2, to further identify every narrowing construction of that factor on which it intends to offer evidence.

"d) To identify the evidence, and all of it, on which it intends to rely in support of the aggravating factors identified, and all other evidence which it intends to introduce in support of its contention that death is the appropriate punishment for this Defendant."

Swisher essentially contends that the Commonwealth should have been required to identify its evidence so that he could have made pretrial challenges to the application of Virginia's capital murder statute. Swisher also asserts that the aforementioned bill of particulars was needed to: insure that he would have effective assistance of counsel as guaranteed by the Sixth Amendment; assist him in challenging the suppression of certain evidence and; assist him in challenging the constitutionality of the vileness and future dangerousness factors in Code § 19.2-264.4, one of which must be established before the death penalty may be imposed. We disagree with Swisher.

"The purpose of a bill of particulars is to state sufficient facts regarding the crime to inform an accused in

10

advance of the offense for which he is to be tried.  He is entitled to no more."  Hevener v. Commonwealth, 189 Va. 802, 814, 54 S.E.2d 893, 899 (1949); accord Goins, 251 Va. at 454, 470 S.E.2d at 123; Quesinberry, 241 Va. at 372, 402 S.E.2d at 223, Strickler, 241 Va. at 490-91, 404 S.E.2d at 233.  A defendant is not entitled to a bill of particulars as a matter of right.  Quesinberry, 241 Va. at 372, 402 S.E.2d at 223. Rather, Code § 19.2-230 states that a trial court "may direct the filing of a bill of particulars."

The trial court's decision whether to require the Commonwealth to file a bill of particulars is a matter that rests within its sound discretion.  Goins, 251 Va. at 454, 470 S.E.2d at 123; Quesinberry, 241 Va. at 372, 402 S.E.2d at 223. The trial court did not abuse its discretion in denying Swisher's motion.  The indictment adequately informed Swisher of the charged offenses, and we are of opinion Swisher did not wish to use the bill to challenge the sufficiency of the indictment, but, as he has admitted in his brief, he desired the bill of particulars for other reasons.

Furthermore, Paragraphs B and D are simply demands for pre-trial disclosure of the Commonwealth's evidence to be introduced at trial and, as we have held, there is no general constitutional right to discovery in a criminal case, even when a capital offense is charged.  See Strickler, 241 Va. at

11

490-91, 404 S.E.2d at 233.  We do note that the Commonwealth, as required by Code § 19.2-264.3:2, provided Swisher with evidence of unadjudicated conduct that the Commonwealth planned to use to establish his future dangerousness, and Swisher does not claim that such information was not given to him.  Moreover, as the trial court observed, Swisher was aware, well before trial, of the entirety of the Commonwealth's evidence through the Commonwealth's undisputed open file policy.

## VI.  DEFENDANT'S MOTIONS TO SUPPRESS

### A.

Swisher filed a motion to suppress a confession that he made to the deputies after he had been given his <u>Miranda</u> warnings, and the trial court denied the motion.  On appeal, Swisher contends that his confessions were "made at a time when he had not been advised of his rights to remain silent and his right to counsel and were not made within the guidelines of the standards set forth in <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966)."  We disagree with Swisher.

In <u>Miranda</u>, the Supreme Court held that an individual must be warned before questioning by police of his right to remain silent and his right to an attorney only when that "individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is

12

subjected to questioning. . . ." Id. at 478. The Supreme Court subsequently explained in Oregon v. Mathiason, 429 U.S. 492, 495 (1977), that Miranda warnings are implicated only during a custodial interrogation:

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."

We have also observed that Miranda warnings are not required in every instance when a suspect is interrogated at a police office. Coleman v. Commonwealth, 226 Va. 31, 47, 307 S.E.2d 864, 872 (1983), cert. denied, 465 U.S. 1109 (1984). We have stated that "[i]t is the custodial nature rather than the location of the interrogation that triggers the necessity for giving Miranda warnings." Id. at 47, 307 S.E.2d at 872; accord Burket v. Commonwealth, 248 Va. 596, 605, 450 S.E.2d 124, 129 (1994), cert. denied, 514 U.S. 1053 (1995); see Beckwith v. United States, 425 U.S. 341, 346 (1976).

13

Applying these principles, we hold that the deputies did not violate Swisher's Miranda rights.  Initially, we note that Swisher did not make any incriminating statements between the time he left his uncles' house and the time he was placed under arrest at 12:05 a.m. on February 24.  Before Swisher was arrested, the deputies informed him that he was free to leave the Sheriff's Office.  After Swisher was arrested, he was informed of his Miranda rights twice.  The record reveals that his confession was made knowingly, voluntarily, and intelligently, Miranda, 384 U.S. at 475, and that his confession was "the product of an essentially free and unconstrained choice by its maker."  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); accord Roach v. Commonwealth, 251 Va. 324, 340-41, 468 S.E.2d 98, 108, cert. denied, 519 U.S. 951 (1996).

B.

Swisher filed a motion to suppress "all evidence, oral and physical, including any statements made by [him], whether prior to or subsequent to his arrest, and any property seized as a result of the arrest, detention or interrogation of [him]" and any property "seized by a warrantless search of the premises occupied by [him], and any property or goods seized by virtue of the search warrant for [his] body, which warrant was issued . . . on [February 25, 1997]."

14

Swisher contends that: his arrest was illegal; the deputies unlawfully searched and seized certain items from the house where he lived and; the deputies unlawfully searched his person by obtaining pubic hair, head hair, and blood.

When the deputies went to Swisher's uncles' house, they knocked on the door, and one of Swisher's uncles permitted the deputies to enter. As we have already stated, the deputies asked Swisher to accompany them to the Sheriff's Office, and he voluntarily agreed to do so. As Swisher was about to leave the house, one of the deputies asked Swisher if he would like to take a jacket with him because it was cold outside. A deputy helped Swisher put the jacket on.

At the Sheriff's Office, Sergeant A.C. Powers noticed a few dark spots on Swisher's jacket, and he asked Swisher for permission to test the jacket to determine whether the spots were blood. Swisher replied, "[t]hat's all right with me, because I don't know nothing about what you're talking about." When the test showed that blood was present on the jacket, Sergeant Lemerise asked Swisher for permission to send the jacket to a forensic laboratory for further testing and Swisher agreed.

While Swisher was still at the Sheriff's Office, some of the deputies asked one of Swisher's uncles for permission to search two large "burn barrels" which were on the uncles'

15

property. The uncle gave the deputies permission to search, and they recovered several items from the barrels, including burned sneakers and a green shirt.

On February 24, 1997, some deputies returned to Swisher's uncles' house and asked William Swisher for permission to search the premises. The deputies gave William Swisher a consent form and told him that he did not have to consent to a search. William Swisher gave the deputies permission to search, and he signed the consent form.

We hold that the trial court did not err in denying the defendant's motion to suppress the evidence because the defendant's uncles gave the deputies consent to search the house and the "burn barrels." We also note that none of the items taken from the consensual search of the "burn barrels" was admitted in evidence at Swisher's trial.

Additionally, the trial court did not err in refusing the defendant's motion to suppress the jacket. Swisher gave the deputies consent to test his jacket. The evidence of record supports the trial court's finding that in each instance, Swisher's consent was voluntary. See Gray v. Commonwealth, 233 Va. 313, 327, 356 S.E.2d 157, 164, cert. denied, 484 U.S. 873 (1987).

We do not consider Swisher's conclusional statement that his arrest was illegal and, therefore, his pubic hairs, head

16

hairs, and blood were illegally seized.  Swisher does not assign as error that he was subject to an illegal arrest.  Thus, this argument is beyond the scope of any assignment of error, and it is procedurally defaulted.  Rule 5:17(c); Burket, 248 Va. at 613, 450 S.E.2d at 133.

VII.  VENUE

Swisher argues that the trial court erred in denying his motion for a change of venue because the media coverage of his crime was purportedly inflammatory and contained information regarding his confession.  Swisher asserts that these aspects of the media coverage required a change of venue in order to protect the rights afforded him under the Sixth Amendment of the United States Constitution.  We disagree.

There is a presumption that a defendant can receive a fair trial from the citizens of the jurisdiction where the crimes occurred.  The defendant must overcome this presumption by demonstrating that the feeling of prejudice on the part of the citizenry is widespread and is such that would "be reasonably certain to prevent a fair trial."  Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992), cert. denied, 507 U.S. 1043 (1993) (quoting Stockton v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 380, cert. denied, 469 U.S. 873 (1984) (citation omitted)).  The decision whether to grant a change of venue rests within the sound

discretion of the trial court. Roach, 251 Va. at 342, 468 S.E.2d at 109. The trial court's ruling whether to change venue will not be disturbed on appeal unless the record affirmatively shows an abuse of discretion. Mueller, 244 Va. at 398, 422 S.E.2d at 388.

Extensive media coverage about an accused and his crimes does not necessarily require a change of venue. Buchanan, 238 Va. at 407, 384 S.E.2d at 767-68. Additionally, a significant factor that the trial court must consider is "the difficulty encountered in selecting a jury." Mueller, 244 Va. at 398, 422 S.E.2d at 388.

Swisher did not overcome the presumption that he could receive a fair trial in Augusta County, and the evidence of record does not affirmatively show that the trial court abused its discretion. Our review of the record reveals that the trial court was able to empanel a jury with relative ease. Swisher does not challenge on the appeal the seating of any juror on the basis of pre-trial publicity. Thus, the trial court did not abuse its discretion in denying Swisher's motion for a change of venue.

### VIII.  VOIR DIRE

Swisher argues that the trial court erred in refusing to permit him to ask certain questions to the jury panel during voir dire. Swisher says that because his trial was

18

extensively covered by the media, he should have been permitted to ask a wide range of questions to potential jurors.  We disagree with Swisher's contentions.

As we stated in LeVasseur v. Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), cert. denied, 464 U.S. 1063 (1984), "[a] party has no right, statutory or otherwise, to propound any question he wishes, or to extend voir dire questioning ad infinitum.  The court must afford a party a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause,' but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so."  Swisher fails to identify any questions that the trial court prohibited.  Swisher's conclusional contention does not specify how the trial court abused its discretion, and he fails to demonstrate how he was prejudiced by the trial court's rulings.

IX.  DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Swisher asserts that the trial court erred by denying his motion to dismiss the indictment charging him with capital murder under Code § 18.2-31(1), which states in relevant part:

> "The following offenses shall constitute capital murder, punishable as a Class 1 felony:
> 1.  The willful, deliberate, and premeditated killing of any person in the commission of abduction, as defined in § 18.2-48, when such abduction was committed with the intent to extort

19

money or a pecuniary benefit or with the intent to defile the victim of such abduction;"

Swisher claims that the term intent "to defile" fails to inform "a defendant or any person of ordinary intelligence of what conduct makes him eligible for a death sentence through commission of capital murder." Continuing, Swisher says that the term intent "to defile" does not provide sufficient guidance to the jury as it considers whether to impose the sentence of death. Swisher claims that these purported statutory deficiencies contravene his constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution.

We find no merit in Swisher's contentions. An act which creates a statutory offense "must specify with reasonable certainty and definiteness the conduct which is commanded or prohibited . . . so that a person of ordinary intelligence may know what is thereby required of him." Caldwell v. Commonwealth, 198 Va. 454, 458, 94 S.E.2d 537, 540 (1956); McCutcheon v. Commonwealth, 224 Va. 30, 35, 294 S.E.2d 808, 811 (1982). We have stated that the phrase intent "to defile" is interchangeable, within the meaning of Code § 18.2-48, with the phrase "sexually molest." Scott v. Commonwealth, 228 Va. 519, 525 n.2, 323 S.E.2d 572, 576 n.2 (1984); see Wilson v. Commonwealth, 249 Va. 95, 103-04, 452 S.E.2d 669, 675, cert.

denied, 516 U.S. 841 (1995).  We are of the opinion that a person of ordinary intelligence would also conclude that the term intent "to defile" is interchangeable with the phrase intent to "sexually molest."  Thus, we hold that the indictment adequately informed Swisher of the charges against him and that the jury would have concluded that the term intent "to defile" was synonymous with the phrase intent to "sexually molest."

### X.  ADMISSIBILITY OF EVIDENCE

As we have already stated, Patricia Taylor testified as an expert witness on the subject of DNA on behalf of the Commonwealth.  During her direct examination, Taylor testified that the DNA profile obtained from sperm found in Snyder's rectum, vagina, esophagus, and stomach was consistent with the mixture of DNA profiles of Swisher and Snyder, that sperm found on the crotch of Snyder's panties was consistent with Swisher's DNA, and that blood found on Swisher's coat was consistent with the DNA profile of Snyder.

During cross-examination, Swisher attempted to examine Taylor about "genetic material" found on a pillowcase which had not been admitted in evidence.  The Commonwealth objected to the defendant's questions about the pillowcase on the basis that the pillowcase had not been admitted in evidence, and the pillowcase was not relevant to any issues at trial.  The trial

21

court gave Swisher's counsel several opportunities to explain to the court the relevance of the pillowcase. The trial court ruled that Swisher's questions about the pillowcase were not relevant because the pillowcase had not been admitted in evidence, no chain of custody had been established which would permit the admission of the pillowcase in evidence, and testimony about the pillowcase would only be confusing to the jury.

The decision to refuse or admit evidence based on relevance rests within the discretion of the trial court, Beck v. Commonwealth, 253 Va. 373, 384-85, 484 S.E.2d 898, 905, cert. denied, ___ U.S. ___, 118 S.Ct. 608 (1997), and we hold that the trial court did not abuse its discretion. Indeed, Swisher's counsel was unable to demonstrate either in the trial court or on brief why the questions about the pillowcase were relevant to any issues at trial.

## XI.  JURY INSTRUCTIONS

Swisher proffered the following jury instructions which were refused by the trial court:

"INSTRUCTION NO. R-1

"If you find that the defendant was so greatly intoxicated by the voluntary use of alcohol and drugs that he was incapable of deliberating or premeditating, then you cannot find him guilty of capital murder or murder in the first degree.

22

"Voluntary intoxication is not a defense to second degree murder or manslaughter."

"INSTRUCTION NO. Q

"You have been instructed on more than one grade of homicide and if you have a reasonable doubt as to the grade of the offense, then you must resolve that doubt in favor of the defendant, and find him guilty of the lesser offense."

"For example, if you have a reasonable doubt as to whether he is guilty of capital murder or first degree murder, you shall find him guilty of first degree murder. If you have a reasonable doubt as to whether he is guilty of first degree murder or second degree murder, you shall find him guilty of second degree murder or of voluntary manslaughter. If you have a reasonable doubt as to whether he is guilty at all, you shall find him not guilty."

Swisher, who stated in his confession to the deputies that he had consumed crack cocaine and alcohol on the day of the murder, argues that the trial court erred by refusing to grant Instruction R-1. Swisher says that the trial court erred by refusing to grant Instruction Q because "the evidence was that [he] was on crack cocaine and one of the effects of the drug is that it inflames the passions of the user."

Swisher's assertions are without merit. Generally, voluntary intoxication is not an excuse for any crime. Wright v. Commonwealth, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988). We have stated that the only exception to this general rule is in cases involving deliberate and premeditated murder. Id. Even though it has long been the rule in this Commonwealth

23

that a defendant may negate the specific intent requisite for capital murder or first degree murder by showing that he was so greatly intoxicated that he was incapable of deliberation or premeditation, Essex v. Commonwealth, 228 Va. 273, 281-82, 322 S.E.2d 216, 219-20 (1984); Fitzgerald, 223 Va. at 631, 292 S.E.2d at 807; Giarratano v. Commonwealth, 220 Va. 1064, 1073, 266 S.E.2d 94, 99 (1980), "[v]oluntary immediate drunkenness is not admissible to disprove malice or [to] reduce the offense to manslaughter." Johnson v. Commonwealth, 135 Va. 524, 531, 115 S.E. 673, 676 (1923) (quoting Willis v. Commonwealth, 73 Va. (32 Gratt.) 929, 926 (1879)).

We hold that the trial court properly refused the defendant's proposed instructions because these instructions contained incorrect statements of the law. The proposed instructions would have permitted the jury to find the defendant guilty of manslaughter because of his purported voluntary intoxication, which is contrary to the common law of this Commonwealth.

### XII.  SENTENCE REVIEW

Former Code § 17-110.1(C)(2) requires this Court to review the imposition of the sentence of death imposed upon Swisher, based on the trial record, to determine whether (i) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or (ii) the sentence

24

is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We observe that Swisher does not contend that the death penalty was imposed under the influence of any of the above factors prohibited by the statute, nor does he contend that the sentence is excessive or disproportionate to the penalty imposed in similar cases. Nevertheless, we have examined the records of all capital cases reviewed by this court, pursuant to former Code § 17-110.1(E). See Barnabei v. Commonwealth, 252 Va. 161, 179-80, 477 S.E.2d 270, 281 (1996), cert. denied, __ U.S. __, 117 S.Ct. 1724 (1997); Breard v. Commonwealth, 248 Va. 68, 89, 445 S.E.2d 670, 682, cert. denied, 513 U.S. 971 (1994).

Upon review of these cases, as well as cases in which life imprisonment was imposed, we hold that Swisher's sentence of death is neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for crimes of a similar nature. Furthermore, based upon our review of the record, we find nothing that suggests that Swisher's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

XIII. CONCLUSION

25

We find no reversible error in the issues presented here. Having reviewed all Swisher's contentions and the imposition of Swisher's sentence of death pursuant to former Code § 17-110.1, we hold that the conviction of capital murder and sentence of death will be affirmed, and we will also affirm the judgments entered for Swisher's non-capital convictions.

Record No. 980677 – <u>Affirmed</u>.
Record No. 980678 – <u>Affirmed</u>.