Present:   All the Justices

BRANDON WAYNE HEDRICK
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record Nos. 982055 & 982056     February 26, 1999

COMMONWEALTH OF VIRGINIA

              FROM THE CIRCUIT COURT OF APPOMATTOX COUNTY
                      Richard S. Blanton, Judge

     In these appeals, we review the capital murder

conviction, sentence of death, and related convictions imposed

upon Brandon Wayne Hedrick.

                          I.  PROCEEDINGS

     The defendant was tried before a jury on indictments for

the following offenses:  capital murder of Lisa Yvonne

Alexander Crider in the commission of robbery, forcible

sodomy, and rape in violation of Code § 18.2-31(4) and (5);

robbery in violation of Code § 18.2-58; rape in violation of

Code § 18.2-61; forcible sodomy in violation of Code § 18.2-

67.1; abduction in violation of Code § 18.2-47; and use of a

firearm in the commission of murder in violation of Code

§ 18.2-53.1.  The jury found the defendant guilty of these

crimes and fixed his punishment at life imprisonment on the

charge of forcible sodomy, life imprisonment on the charge of

rape, life imprisonment on the charge of robbery, ten years

imprisonment on the charge of abduction, and three years

imprisonment on the charge of use of a firearm in the commission of a felony.

In the penalty phase of the capital murder trial, the jury fixed the defendant's punishment at death, finding that he represented a continuing serious threat to society and that his offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim. After considering a report prepared by a probation officer pursuant to Code § 19.2-264.5, the trial court sentenced the defendant in accord with the jury verdicts.

We consolidated the automatic review of the defendant's death sentence with his appeal of the capital murder conviction. Code § 17.1-313(F). The defendant's appeal of his non-capital convictions was certified from the Court of Appeals, Code § 17.1-409, and was consolidated with his capital murder appeal and given priority on our docket.

## II. THE EVIDENCE

On May 10, 1997, William K. Dodson, Trevor Jones, and the defendant were together at Jones' apartment in Lynchburg. The defendant and Jones decided to leave the apartment and drive to an area in downtown Lynchburg where they could find some prostitutes. Dodson remained at the apartment.

Jones drove his truck to an area near Fifth and Madison Streets in Lynchburg where the defendant and Jones met two prostitutes. The defendant and Jones gave the prostitutes money, asked them to purchase a small quantity of crack cocaine, and returned to Jones' apartment with the women. The defendant and Jones smoked the crack cocaine that they purchased, and the women smoked their own cocaine. Jones, the defendant, and Dodson had sexual relations with the prostitutes. The defendant and Jones, along with the women, returned to the area near Fifth and Madison Streets. The defendant and Jones gave the women $50 and asked them to purchase some more crack cocaine. The women took the money but never returned.

The defendant and Jones then rode around in Jones' truck for about 45 minutes. They met two different prostitutes and returned with them to Jones' apartment. The defendant and Jones drank bourbon, smoked marijuana, and had sexual relations with the women. Dodson, who was still at Jones' apartment, was asleep when these women were present.

Around 11:00 p.m., the defendant and Jones, along with the prostitutes, left the apartment and returned to the area near Fifth and Madison Streets. After the women left Jones' truck, Jones observed Crider "walking down the road." Jones, who had met Crider previously, told the defendant that

Crider's boyfriend was a seller of crack cocaine.  The defendant and Jones decided to "pick up" Crider, have sexual relations with her, and rob her because they thought she may have crack cocaine in her possession.

Jones approached Crider and "asked if she wanted to have sex."  Crider got into Jones' truck, and the defendant, Jones, and Crider went to Jones' apartment.  Once they arrived at the apartment, Jones paid Crider $50 and had sexual intercourse with her.  The defendant did not have sexual relations with Crider at the apartment.

After Jones had sexual intercourse with Crider, he left his bedroom while Crider was "getting dressed."  Jones went to a living room and spoke with the defendant.  The defendant and Jones devised a plan in which the defendant would pretend to rob both Jones and Crider.  Jones did not want Crider to know that he was involved in the robbery because Crider knew where Jones lived, and Jones was afraid that Crider's boyfriend would retaliate against him.

Jones told the defendant to leave the apartment, go to Jones' truck, and get Jones' shotgun.  While the defendant was retrieving the shotgun, Jones told Crider that he had lost his keys, and she began to help him look for the supposedly lost keys.  Jones went into the kitchen, got some duct tape, returned to the bedroom, and placed the tape there.  Jones

4

also got a set of handcuffs. When the defendant entered the house with the shotgun, Jones and Crider were in the kitchen. The defendant "racked" the pump on the shotgun to "get [Crider's] attention," and the defendant "motioned for" Crider and Jones and told them to go into Jones' bedroom.

The defendant ordered Jones to empty Crider's pockets, and Jones took the $50 bill that he had paid Crider, cigarettes, and a cigarette lighter. The defendant told Jones to place the handcuffs on Crider. Jones did so. Jones also covered Crider's eyes and mouth with duct tape, and he placed a shirt over her face. The defendant took Crider out of the apartment and placed her in Jones' truck.

Dodson, who had been asleep in the living room, woke up when he heard the sound caused when the defendant "racked" the pump on the shotgun. In response to Dodson's question, "what . . . is going on?", Jones responded that, "this is one of the girls that ripped us off; we're just going to scare her."

The defendant, Jones, and Crider left the apartment about 1:00 a.m. Jones sat in the driver's seat. The defendant and Crider were in the backseat of the truck. The defendant removed the shirt and duct tape from Crider. After riding around in the truck for some time, the defendant decided that he wanted to have sexual intercourse with Crider. The defendant told Crider that he "wanted some ass." The

5

defendant warned her, "don't try anything; I got a twenty-five," referring to a .25-caliber pistol. Jones stopped the truck and got out. The defendant raped Crider.

After the defendant raped Crider, he got out of the truck and spoke with Jones. The defendant told Jones that the defendant did not want to return Crider to the downtown area of Lynchburg because he was "afraid something might happen." The defendant, because he had just raped Crider, was afraid that "she might come back on him with her boyfriend." The defendant and Jones had a brief conversation, "about killing" Crider, and decided to do so.

The defendant and Jones got back into the truck. Crider was crying. She was "upset" and "scared." Jones drove the truck as he and the defendant tried to find a good location to kill Crider. As the defendant and Jones continued to look for a place to kill Crider, Jones drove the truck into Appomattox County. Crider, who "kind of figured" that the defendant and Jones intended to harm her, pled, "don't kill me; I got two kids." She was "sniffling and crying."

Crider, continuing to plead for her life, asked: "[I]s there anything I can do to make ya'll not do this?" The defendant responded, "if you suck my dick, I'll think about it." Crider then performed oral sodomy on the defendant.

Jones continued to drive the truck, and he proceeded on a road in Appomattox County and drove onto a "pull-off" space on a "back road" near the James River. The defendant got out of the passenger side of the truck with the shotgun, and Jones took Crider out of the truck. Jones removed the handcuffs from Crider because he was afraid that his fingerprints were on them. The defendant and Jones put gloves on their hands to avoid leaving their fingerprints at the crime scene.

The time was now "daybreak." Crider, who was crying, continued to beg the defendant and Jones not to kill her, saying, "I got two kids." After Jones had removed the handcuffs from Crider, he bound her hands together with duct tape. He also placed duct tape around her mouth and around her eyes. The defendant was standing, watching with the shotgun in his hands.

The defendant, Jones, and Crider walked toward the river bank. Jones led Crider because she was "blindfolded." Jones "turned [Crider and] faced her back to the river." Jones turned to the defendant, who was armed with the shotgun, and said, "do what you got to do." Jones began to walk to the truck. When Jones was within 10 feet from the truck, he heard a gunshot.

The defendant returned to the truck with the shotgun and told Jones that Crider "went into the river." Jones took the

7

shell from the shotgun so that it would not be present at the scene. The defendant and Jones returned to Lynchburg. They disposed of the shotgun shell, duct tape, and other evidence en route to Lynchburg. They arrived at Jones' apartment at about 6:30 or 7:00 a.m. on Sunday morning, and went to sleep.

The defendant and Jones subsequently fled Virginia, and they were arrested in Lincoln, Nebraska. The shotgun that the defendant used to kill Crider was found in Jones' truck, which he had driven to Nebraska.

Sherry Kelly Mays and Warren Johns, two friends who had gone to the James River to fish, found Crider's body on the evening of May 11, 1997. Crider's body had been placed in such a manner that the body appeared to be "sitting up with [the] feet crossed," and the victim's hands were bound with duct tape.

Dr. David Oxley, a deputy chief medical examiner for the Commonwealth of Virginia, qualified as an expert witness on the subject of forensic pathology. He performed an autopsy on Crider's body. Dr. Oxley testified that an examination of the body revealed that Crider had been shot in the face with a shotgun. Several of her teeth were missing and other teeth were fractured. The top portion of her head had been bound with silver duct tape, which extended to the bridge of her nose. Duct tape was also found around her mouth.

8

The shotgun wound caused massive injury to Crider's brain, and shot pellets and wadding were found in the interior of her cranial cavity. The location of the shotgun wad, deep in the victim's cranial cavity, indicated that she was killed within a "range of fire of less than ten feet." The entrance wound from the shotgun blast measured an inch and a half in greatest diameter. An x-ray of Crider's skull showed the presence of shotgun pellets in her skull and brain. A blood sample was extracted from Crider's body, and a toxicology screen on that sample revealed an absence of any "drugs of abuse or prescription drugs" in her blood system.

Robert L. Strubel, a forensic scientist, qualified as an expert witness on the subject of blood stain pattern analysis. He testified that based upon his analysis of certain photographs, after Crider had been shot in the face her body was moved and placed in the position where Sherry Mays found the body.

Elizabeth Bush, a forensic scientist, qualified as an expert witness on the subject of DNA (deoxyribonucleic acid) and DNA testing. She conducted DNA tests which revealed that the possibility of a person other than the defendant providing a sperm sample found in the victim's vagina was one out of 260,000 in the Caucasian population, one out of 1,000,000 in

9

the Hispanic population, and one out of 8,000,000 in the Black population.  The defendant is Caucasian.

Richard V. Roberts qualified as an expert witness on the subject of firearms.  He examined the shotgun that the defendant used to kill Crider, shotgun shells, and waddings.  He also examined the wadding that was removed from Crider's brain.  Based upon his tests and examination, which included a pattern spray of 12-gauge shotgun shells, he concluded that the muzzle of the shotgun was three to seven feet from Crider's mouth when she was killed.

### III.  EVIDENCE ADDUCED IN PENALTY PHASE

During the penalty phase of the capital murder proceedings, the Commonwealth adduced the following evidence.  The defendant had been convicted of three robberies in three different jurisdictions.  The defendant was armed with a "Rambo type" knife when he participated in robberies in Campbell County and Bedford County.  The defendant was armed with a shotgun when he robbed a motel clerk in Farmville.  During that robbery, the defendant, wearing a hood over his head and a bandanna around his face, pointed the shotgun at the clerk, who was five or six feet away from him, and demanded money.

In September 1997, after the defendant had been arrested for the murder of Crider, and while being transported from

Appomattox to the Campbell County Jail, he tried to take a deputy sheriff's revolver. The defendant later had to be restrained while being transported. In July 1997, the defendant attempted to escape from incarceration by climbing a fence.

The defendant told a State police officer that he shot Crider and that "he was an avid hunter, he liked to hunt . . . and how good a shot he was, how he killed deer in the past using shotguns and rifles at long range."

IV.  ASSIGNMENT OF ERROR PROCEDURALLY DEFAULTED

The defendant argues that the trial court erred in refusing to grant his "motion to dismiss the capital murder charges on the grounds that the capital murder statutes are unconstitutional." In support of his contention, the defendant merely refers this Court to a memorandum of law that he filed in the trial court. We hold that the defendant's assertions are insufficient and constitute a procedural default. "An appellant who asserts that a trial court's ruling was erroneous has an obligation to state clearly to the appellate court the grounds for that assertion. A cross-reference to arguments made at trial is insufficient." Spencer v. Commonwealth, 240 Va. 78, 99, 393 S.E.2d 609, 622, cert. denied, 498 U.S. 908 (1990); Swisher v. Commonwealth, 256 Va. 471, 479, 506 S.E.2d 763, 767 (1998); Jenkins v.

11

Commonwealth, 244 Va. 445, 460-61, 423 S.E.2d 360, 370 (1992), cert. denied, 507 U.S. 1036 (1993).

### V.  ISSUE PREVIOUSLY DECIDED

The defendant argues that the trial court erred in refusing his motion for a jury questionnaire.  We have previously held that a trial court is not required to permit a defendant to mail a questionnaire to the potential jurors.  See Swisher, 256 Va. at 479, 506 S.E.2d at 767; Goins v. Commonwealth, 251 Va. 442, 454, 470 S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996); Strickler v. Commonwealth, 241 Va. 482, 489-90, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944 (1991).  We will adhere to our previous rulings, and we will not discuss the jury questionnaire issue further.

### VI.  BILL OF PARTICULARS

The defendant argues that the trial court erred in refusing his motion for a bill of particulars.  We hold that the defendant's contention is without merit.  The trial court's decision whether to require the Commonwealth to file a bill of particulars is a matter which rests within the trial court's sound discretion.  Swisher, 256 Va. at 480, 506 S.E.2d at 768; Goins, 251 Va. at 454-55, 470 S.E.2d at 122-23; Quesinberry v. Commonwealth, 241 Va. 364, 372, 402 S.E.2d at 218, 223, cert. denied, 502 U.S. 834 (1991).  The defendant simply does not explain how the trial court abused its

12

discretion by failing to grant his motion for a bill of particulars. The defendant's conclusional argument fails to identify any error by the trial court.

## VII. ADMISSIBILITY OF EVIDENCE

At trial, the Commonwealth was permitted, over the defendant's objection, to introduce in evidence an enlarged photograph of the victim's face. The photograph, which was approximately two feet by three feet in size, revealed the injuries that the victim suffered when the defendant shot her in the face with the shotgun. The defendant argues that the trial court erred by admitting this photograph in evidence because it was duplicative of another photograph of the victim's face which had not been enlarged, and the photograph was inflammatory and gruesome.

We disagree with the defendant's contentions. We have held that the admission of photographs in evidence rests within the sound discretion of the trial court. Walton v. Commonwealth, 256 Va. 85, 91, 501 S.E.2d 134, 138 (1998); Goins, 251 Va. at 459, 470 S.E.2d at 126. Photographs of a victim are admissible to show intent, method, malice, motive, premeditation, and the atrociousness of the crime. Walton, 256 Va. at 92, 501 S.E.2d at 138. Photographs which accurately depict the crime scene are not rendered inadmissible simply because they are gruesome or shocking.

13

Id.; Goins, 251 Va. at 459, 470 S.E.2d at 126; Gray v.
Commonwealth, 233 Va. 313, 343, 356 S.E.2d 157, 173, cert.
denied, 484 U.S. 873 (1987).  We have examined the photograph,
and we hold that the trial court did not abuse its discretion.

### VIII.  AGGRAVATED BATTERY

Code § 19.2-264.2 states:

> "In assessing the penalty of any person
> convicted of an offense for which the death penalty
> may be imposed, a sentence of death shall not be
> imposed unless the court or jury shall (1) after
> consideration of the past criminal record of
> convictions of the defendant, find that there is a
> probability that the defendant would commit criminal
> acts of violence that would constitute a continuing
> serious threat to society or that his conduct in
> committing the offense for which he stands charged
> was outrageously or wantonly vile, horrible or
> inhuman in that it involved torture, depravity of
> mind or an aggravated battery to the victim; and (2)
> recommend that the penalty of death be imposed."

The jury, in accordance with this statute, sentenced the
defendant to death finding that there is a probability that
the defendant would commit criminal acts of violence that
would constitute a continuing serious threat to society and
that the defendant's conduct was wantonly vile, horrible, or
inhuman.

During the penalty phase of the capital murder
proceeding, the defendant proffered the following jury
instruction which the trial court refused:  "A single gunshot
wound causing immediate death does not constitute an

14

aggravated battery of the victim."  The defendant contends that he did not commit an aggravated battery upon Crider and, citing Godfrey v. Georgia, 446 U.S. 420 (1980), asserts that "an aggravated battery is not proven where the evidence shows that the victim died almost instantaneously from a single gunshot wound."  The defendant's argument is without merit.

We have stated that "[w]ithin the context of [Code § 19.2-264.2], the term 'aggravated battery' means 'a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder.'" Sheppard v. Commonwealth, 250 Va. 379, 392, 464 S.E.2d 131, 139 (1995), cert. denied, 517 U.S. 1110 (1996) (quoting Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979)).

Here, there was more than sufficient evidence which would have permitted the jury to find, beyond a reasonable doubt, that the defendant committed an aggravated battery upon Crider.  Before the defendant murdered Crider, he had robbed and raped her, forced her to perform an act of oral sodomy upon him, bound her hands with duct tape, covered her eyes and mouth with duct tape, and held her in captivity for five hours.  He subsequently removed the duct tape from her hands and restrained her with handcuffs.  The defendant, an avid hunter who considered himself skilled with firearms, shot the

15

victim in the face with the shotgun, as she stood helplessly awaiting her execution at a distance of three to seven feet from the barrel of the shotgun. Without question, under the facts and circumstances of this case, the manner in which the defendant terrorized and killed Crider was qualitatively and quantitatively more culpable than the minimum necessary to accomplish an act of murder.

The United States Supreme Court's decision in Godfrey v. Georgia, supra, is not controlling here and is factually distinguishable. In Godfrey, a defendant, who had been convicted of capital murder, killed two people by shooting each victim once with a rifle. There was no other evidence of physical injury. The Supreme Court, which reversed judgment confirming the sentence of death, stated that

> "[n]o claim was made, and nothing in the record
> before us suggests, that the petitioner committed an
> aggravated battery upon [the victims], or, in fact,
> caused either of them to suffer any physical injury
> preceding their deaths. Moreover, in the trial
> court, the prosecutor repeatedly told the jury — and
> the trial judge wrote in his sentencing report —
> that the murders did not involve 'torture.'" 446
> U.S. at 432.

Unlike the defendant in Godfrey, Hedrick committed an aggravated battery upon Crider and caused her to suffer physical injury and torture preceding her death.

Moreover, we have held that "a mere inspection of the statutory language in [Code § 19.2-264.2] demonstrates clearly

16

that the term 'vileness' includes three separate and distinct factors, with the proof of any one factor being sufficient to support a finding of vileness and hence a sentence of death." Bunch v. Commonwealth, 225 Va. 423, 442, 304 S.E.2d 271, 282, cert. denied, 464 U.S. 977 (1983).  We have also stated that: "Code §§ 19.2-264.2 and -264.4(C) define vileness as conduct that involves torture, depravity of mind, or aggravated battery to the victim; the use of the disjunctive word 'or,' rather than the conjunctive 'and,' signifies the availability of alternative choices."  Id.  Here, the evidence was overwhelming that the defendant's conduct showed a depravity of mind and torture, which the defendant does not challenge on appeal.

Furthermore, we also observe that the jury found beyond a reasonable doubt that there was a probability, based upon the evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which the defendant was accused, that he would commit criminal acts of violence that would constitute a continuing, serious threat to society.  The defendant does not challenge this finding, which is a separate and independent basis for the imposition of the death penalty in this case.

IX.  SUFFICIENCY OF THE EVIDENCE

17

The defendant argues that the trial court erred "in refusing to set aside the verdicts of the jury finding [him] guilty of robbery, rape and forcible sodomy as contrary to the law and the evidence."  The defendant, in another assignment of error, argues that the trial court erred in refusing to set aside the verdicts of the jury finding the defendant guilty of capital murder in the commission of robbery, capital murder in the commission of rape, and capital murder in the commission of forcible sodomy.  The defendant's contentions are without merit.

The standard of review for determining the sufficiency of evidence on appeal is well established.  We must examine the evidence in the light most favorable to the Commonwealth, the prevailing party at trial, and we will not disturb the trial court's judgment unless it is plainly wrong or without evidence to support it.  Goins, 251 Va. at 466, 470 S.E.2d at 130; Beavers v. Commonwealth, 245 Va. 268, 281-82, 427 S.E.2d 411, 421, cert. denied, 510 U.S. 859 (1993); Code § 8.01-680. Here, the evidence of record established, beyond a reasonable doubt, that the defendant robbed Crider, raped her, and forced her to commit an act of oral sodomy.  The defendant and Jones decided before they asked Crider to get into Jones' truck that they would rob her of crack cocaine.  The defendant admitted to deputy sheriffs that he ordered Jones and Crider to a

18

bedroom where he demanded that she empty her pockets.  At

trial, the defendant admitted that he brought the shotgun into

the apartment as part of the plan to rob the victim.

As we have already stated, Jones testified that the

defendant told the victim he "wanted some ass," and the

defendant told Crider, before raping her, "don't try anything;

I got a twenty-five [caliber pistol]."  Jones also testified

that when the victim begged the defendant and Jones not to

kill her, the defendant told her that he would consider

sparing her life if she performed oral sodomy upon him.  Thus,

we hold that the jury's findings are fully supported by the

evidence.

## X.  COMMUTATION

The defendant argues that the trial court erred in

failing to commute the death sentence to a sentence of life

imprisonment.  We disagree.

Code § 19.2-264.5 states in relevant part:

> "When the punishment of any person has been
> fixed at death, the court shall, before imposing
> sentence, direct a probation officer of the court to
> thoroughly investigate the history of the defendant
> and any and all other relevant facts, to the end
> that the court may be fully advised as to whether
> the sentence of death is appropriate and just.
> Reports shall be made, presented and filed . . .
> [and] such reports shall in all cases contain a
> Victim Impact Statement. . . .  After consideration
> of the report, and upon good cause shown, the court
> may set aside the sentence of death and impose a
> sentence of imprisonment for life."

Our review of the record reveals that the trial court gave thorough consideration to the evidence and properly discharged its statutory duties imposed by Code § 19.2-264.5. And, the defendant simply failed to show good cause why the sentence of death should not be imposed.

## XI.   PASSION AND PREJUDICE

Code § 17.1-313(C)(1) requires that we determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor."  The defendant argues that "the fact that the jury . . . imposed the maximum possible sentence in all of the predicate cases, when each of the predicate offenses was, standing alone, clearly not a maximum penalty offense, indicates that the jury gave no consideration whatever to the actual offenses involved, but blindly followed the request and recommendation of the Attorney for the Commonwealth.  It seems clear that the rape in this case, and the sodomy, involving a victim whose profession was prostitution, and who was in no way physically injured in the offense, do not rationally support life sentences for each offense."  Continuing, the defendant says that his robbery of the victim was "so little supported by the evidence that, absent the murder later, it would not have resulted in any conviction whatever."

20

We find no merit in the defendant's assertions.  The defendant's argument that the victim was not physically injured ignores the undisputed fact that he killed her with a shotgun blast to her face at close range while she was bound and gagged with duct tape.  Additionally, the defendant abducted the victim for over five hours, and the victim was forced "to experience the horror of waiting for [her] execution."  Briley v. Commonwealth, 221 Va. 563, 579, 273 S.E.2d 57, 67 (1980).  Our review of the record indicates that the jury and the trial court gave thoughtful and careful consideration to all the evidence, and we find nothing in the record before us which suggests that the jury or the trial court imposed the sentences of death under the influence of passion, prejudice, or other arbitrary factors.

XII.  EXCESSIVENESS AND DISPROPORTIONALITY

Code § 17.1-313(C)(2) requires this Court to consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes."  Murphy v. Commonwealth, 246 Va. 136, 145, 431 S.E.2d 48, 54, cert.

21

*denied*, 510 U.S. 928 (1993); <u>Walton</u>, 256 Va. at 96, 501 S.E.2d at 140.

Our comparison of the record in this case with the records in capital cases, including capital cases in which life sentences were imposed, fails to indicate that the death penalty imposed here is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We have examined the records of all capital cases reviewed by this Court pursuant to Code § 17.1-313(E). <u>See</u> <u>Swisher</u>, 256 Va. at 488-89, 506 S.E.2d at 773.

## XIII.  CONCLUSION

Having reviewed the sentence of death and related convictions, finding no reversible error in the record, and perceiving no reason to commute the death sentence, we will affirm the judgment of the trial court.

Record No. 982055 —<u>Affirmed</u>.
Record No. 982056 —<u>Affirmed</u>.

22