Present:  All the Justices

TERESA WILSON BEAN LEWIS

v.    Record No. 032153

                    OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.
                              March 5, 2004

COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
                      Charles J. Strauss, Judge

     As required by Code § 17.1-313, we review the sentences

of death imposed upon Teresa Wilson Bean Lewis.

                                I.

     On November 20, 2002, the defendant was indicted by a

grand jury for the following offenses:  capital murder for

hire of Charles J. Lewis in violation of Code § 18.2-31(2);

capital murder for hire of Julian Clifton Lewis, Jr., in

violation of Code §§ 18.2-31(2); conspiracy to commit capital

murder in violation of Code §§ 18.2-22 and -31; robbery of

Julian Clifton Lewis, Jr., in violation of Code § 18.2-58; use

of a firearm to commit the murder of Julian Clifton Lewis,

Jr., in violation of Code § 18.2-53.1; use of a firearm to

commit the murder of Charles J. Lewis in violation of Code

§ 18.2-53.1; and use of a firearm to commit the robbery of

Julian Clifton Lewis, Jr., in violation of Code § 18.2-53.1.

     The defendant pled guilty to these offenses.  Before

accepting the pleas, the circuit court questioned the

defendant and made a determination that her guilty pleas were made voluntarily, intelligently, and knowingly. Additionally, the court considered a competency assessment of the defendant made by Barbara G. Haskins, M.D., a board-certified forensic psychiatrist. Dr. Haskins opined that the defendant had the capacity to enter pleas of guilty to charges of capital murder and had the ability to understand and appreciate the possible penalties that might result from her pleas.

Haskins stated the following in her competency assessment:

> "Ms. Lewis is aware of her charges and the possible penalties she is facing (life without parole or death). She knows who her attorneys are and feels comfortable working with them. She is able to provide them with information, and to ask questions.
> "Cognitive testing showed a Full Scale IQ of 72. Verbal IQ was 70, and Performance IQ was 79. This places the defendant in the borderline range of mental retardation (Borderline Intellectual Function)."

Haskins opined that Lewis, who had graduated from high school and had completed one year of college, was competent to stand trial, make a plea agreement and enter pleas.

The Commonwealth submitted, and the circuit court accepted, a written summary of the evidence that the Commonwealth would have presented had the case proceeded to a trial. The circuit court scheduled a separate hearing to consider evidence before fixing punishments. The circuit

2

court also received the probation officer's report in the manner prescribed by law.

After considering the evidence adduced during the sentencing hearing and the written summary of the Commonwealth's evidence, the circuit court found that the defendant's conduct was outrageously or wantonly vile, horrible, or inhumane and sentenced her to death for both capital murder offenses. The court fixed her punishments for the remaining convictions as follows: 20 years imprisonment for each conspiracy charge; life imprisonment for the robbery charge; and 13 years imprisonment for the firearms charges.

The court conducted a post-sentencing hearing and clarified its decision regarding the imposition of the sentences of death. The court stated that the defendant's sentences of death were based upon the statutory vileness predicate because her acts reflected a depravity of mind. The court also concluded that the actual murderers had committed aggravated batteries upon each victim and those aggravated batteries were imputed to the defendant.

## II.

Julian Clifton Lewis, Jr., had been employed for several years by Dan River, Inc. His first wife, who had been ill for a long time, died in January 2000. In March or April 2000, Julian Lewis met the defendant, who was also employed by Dan

3

River.  The defendant began to live with Julian Lewis at his home in Danville in June 2000.  Subsequently, Julian Lewis married the defendant.

In December 2001, Julian Lewis' older son, Jason Clifton Lewis, died in a car accident.  Julian Lewis was the beneficiary of his son's life insurance policy, and Julian Lewis received proceeds in excess of $200,000.  He placed those proceeds in a draft account with Prudential Securities, Inc.  The proceeds of the account were accessible only by use of drafts bearing the signature of Julian Lewis.

In February 2002, Julian Lewis purchased a five-acre parcel of land in Pittsylvania County.  He also purchased a mobile home and placed it on the property, where he and the defendant resided.

In August 2002, Julian Lewis' younger son, Charles J. Lewis, an Army reservist, was required to report for active duty with the National Guard in Maryland.  According to Lieutenant Michael Booker, Charles Lewis' commanding officer, Lewis made estate arrangements in the event he died while on active duty.  Charles Lewis executed a will and identified his father as his primary beneficiary and his stepmother, the defendant, as the secondary beneficiary.  Charles Lewis obtained a policy of life insurance in the amount of $250,000 payable in the event of his death.  He designated his father

4

as the primary beneficiary of the life insurance policy and the defendant as the secondary beneficiary.

In the autumn of 2002, Rodney L. Fuller and Matthew J. Shallenberger met the defendant at a retail store. Prior to this meeting, the defendant did not know these men. After a conversation, Shallenberger and the defendant exchanged telephone numbers and began to communicate frequently. Shallenberger and the defendant discussed the possibility that Shallenberger, with Fuller's help, would kill Julian Lewis, and they would share any insurance proceeds that the defendant might receive.

One day, the defendant and her 16-year-old daughter, Christie Bean, met Shallenberger and Fuller at a parking lot in Danville. Christie, who had never met Fuller previously, had sexual intercourse with him in one car while the defendant and Shallenberger engaged in sexual intercourse in another vehicle. On a later date, Fuller and Shallenberger went to the defendant's home where she performed a "lingerie show" for the men, and she had sexual intercourse with both men.

On October 23, 2002, the defendant met Shallenberger and Fuller at a shopping center in Danville. The defendant went to a bank and obtained $1,200 in cash that she gave to the men to use to purchase firearms and ammunition to kill Julian Lewis. Antwain D. Bennett, an acquaintance of Shallenberger,

5

used the money to purchase three firearms. Two of the firearms were shotguns. Additionally, Bennett purchased ammunition for the weapons.

On that same date, the defendant told Shallenberger and Fuller the route that Julian Lewis traveled from his place of employment to his home. The men planned to kill Julian Lewis and "make the murder . . . look like a robbery." While the defendant remained at her home, the men were "to follow and stop Julian Lewis on the highway and kill him." The plan, however, was unsuccessful.

Consequently, the defendant, Shallenberger, and Fuller decided to kill Julian Lewis at his home on October 30, 2002. They also decided to kill his son, Charles Lewis, when he returned to Virginia to attend his father's funeral and share the proceeds from Charles Lewis' policy of life insurance. However, when the conspirators learned that Charles Lewis would be with his father at the mobile home on October 30, 2002, they decided to kill him and his father simultaneously.

During the early morning of October 30, 2002, Shallenberger and Fuller drove a vehicle past the Lewis' home about three times. The men did not stop their vehicle because they observed that lights were on in the home. Eventually, Shallenberger and Fuller entered the residence through a rear door that the defendant had unlocked. Each man carried one of

6

the shotguns that had been purchased with the $1,200 cash the defendant had given them. Shallenberger and Fuller awakened the defendant, who was in bed with her husband. Shallenberger told the defendant, "Teresa, get up." The defendant got out of her bed and walked into the kitchen, and she heard gunshots. Shallenberger shot Julian Lewis several times. The defendant went to the bedroom where her husband lay bleeding, retrieved Julian Lewis' pants and wallet, and returned to the kitchen with Shallenberger.

Fuller entered a room that was occupied by Charles Lewis. Fuller shot Charles Lewis three times. Then Fuller went to the kitchen where he observed the defendant and Shallenberger "pulling money from a wallet." Fuller told the defendant and Shallenberger that Charles Lewis "wouldn't die." Fuller got Shallenberger's shotgun and returned to the bedroom occupied by Charles Lewis where Fuller shot him two more times. The men retrieved most of the shotgun shells, and they divided $300 in cash that had been taken from Julian Lewis' wallet.

After shooting the victims, Shallenberger told the defendant that he was sorry she "had to go through something like this; hugged her and kissed her; and the men left." The defendant waited about 45 minutes after the "last shot was fired," and she made a telephone call to her former mother-in-

7

law, Marie Bean.  Next, she made a telephone call to her best friend, Debbie Yeatts.

On Wednesday morning, October 30, 2002, approximately 3:55 a.m., the defendant placed a telephone call to emergency response personnel in Pittsylvania County.  She reported that an intruder had entered her home and shot her husband and his adult son.  She stated that both men were dead.  She said that she had been in the bed with her husband when an intruder armed with a pistol entered her bedroom and said, "Get up."  Her husband told her to go into the bathroom, and her husband asked the intruder, "What's going on?"  The defendant said that her husband was shot four or five times while she was in the bathroom.  She reported that the shooting had occurred at 3:15 or 3:30 a.m.

Sheriff deputies Harris Silverman and Corey Webb arrived at the murder scene at approximately 4:18 a.m., 23 minutes after the defendant made the telephone call to the emergency response personnel.  The deputies met the defendant at the front door of her home, and she stated that her husband's body was on the floor in one bedroom and that her stepson's body was in another bedroom.  When Deputy Webb entered the master bedroom, he learned that Julian Lewis was alive.  Julian Lewis "made slow moans" and uttered, "[B]aby, baby, baby, baby."  Deputy Webb asked the victim his name, and he responded,

8

"Julian." Deputy Webb asked Julian Lewis if he knew who had shot him, and the victim responded, "My wife knows who done this to me."

While the deputies tried to assist the victims, Deputy Webb observed the defendant conversing on the telephone, and he heard her state, "I told C.J. [Charles Lewis] about leaving that back door unlocked." Julian Lewis died in his residence. When Deputy Webb informed the defendant that her husband and stepson were dead, she did not appear upset.

Investigator J.T. Barrett of the Pittsylvania County Sheriff's Office arrived at the murder scene approximately 7:00 a.m. on October 30, 2002. Barrett interviewed the defendant twice. Investigator Keith N. Isom also interviewed the defendant. During one of the interviews, the defendant claimed that her husband had physically assaulted her a few days before his death, and she denied knowledge of her husband's killer. She said that she would not kill her husband or have him killed.

Investigator Barrett asked the defendant what she and her husband did before they went to bed on the night of the murders. She said that she talked with her husband, and that they prayed together. She told her husband that she was going to pack his lunch, and he went to sleep. She prepared a lunch and placed it in the refrigerator. She wrote a note on the

9

lunch bag that stated, "I love you.  I hope you have a good day."  A picture of a "smiley face" was drawn on the bag and inscribed in the "smiley face" was the message, "I miss you when you're gone."

Mike Campbell, Lewis' supervisor, testified that Julian Lewis did not use bags to bring his lunch to work.  Rather, Julian Lewis took his lunch to work in a blue and white cooler.

Investigator Isom interviewed the defendant again on November 7, 2002.  During this interview, the defendant admitted that she had offered Matthew Shallenberger money if he would kill her husband.  After the interview, the defendant again spoke with Investigator Isom.  The defendant told Isom that she had met her husband's killer at a retail store and that he was from New York.  The defendant stated that she had "let him in" her mobile home, and he shot both Julian Lewis and Charles Lewis, took some money, and left.  She told the investigator that she had agreed to give Shallenberger half of the insurance proceeds that she expected to receive, but she changed her mind and decided to keep all the money.  She informed the investigator of Shallenberger's address, and Isom and the defendant went to Shallenberger's residence where she identified him.

On November 8, 2002, the defendant, who was in the Danville City Jail, requested to speak with Investigator Isom. He interviewed her at the jail, and she told Isom that Rodney Fuller was also involved in the murders of her husband and stepson. The defendant also stated that her daughter had assisted with the murders. The defendant "acknowledged that after the shooting and after the men left the house [on the night of the murders], she had waited about thirty minutes to call 911."

On the day of the murders, the defendant made a telephone call to Campbell and told him that her husband had been killed, and that she wanted his paycheck. Campbell informed the defendant that she could not retrieve the paycheck before 4:00 p.m. on that day. The next day, October 31, 2002, the defendant again called Campbell and asked for Julian Lewis' paycheck. Campbell responded that he could not give the paycheck to her.

Lieutenant Michael Booker, Charles Lewis' commanding officer, called the defendant to express his condolences early on the afternoon of October 30, 2002, the day of the murders. The defendant told him, "I'm still in shock. The police had me in Chatham today, all in my face. There is no way I would have killed my husband and stepson. They guessed that because I didn't get shot that I might have done it. My husband told

11

me to go into the bathroom, so I did."  The defendant informed Booker that she was the secondary beneficiary on the life insurance policy of Charles Lewis, and that she wanted the insurance proceeds.

On November 4, 2002, the defendant called Booker by telephone and left a message for him because he was not available.  When Booker spoke to her later that day, the defendant asked him about Charles Lewis' personal effects. Booker advised the defendant that she could not have them because she was not the beneficiary of Lewis' estate.  The defendant asked Booker whether she was still entitled to the life insurance proceeds in the amount of $250,000.  Booker told the defendant that she was, and she responded, "[W]ell, Kathy [Charles Lewis' sister] can have all his stuff as long as I get the money."

Before the murders, the defendant told a woman, Debbie Anderson, that the defendant was just "using Julian for money and that he would buy her things."  Bobby Demont, who had known Julian Lewis and the defendant for several years, heard the defendant say "a couple months before the murders" that if Julian died, "she would get the money, and if [Charles Lewis] was killed and Julian was dead, she would get that money, too."

12

The defendant told Kathy L. Clifton, Julian Lewis' daughter, that the defendant waited 45 minutes after the murders and then called her ex-mother-in-law, Marie Bean, and her best friend, Debbie Yeatts, before she "called 911 for help." On the day of the victims' funerals, the defendant told Kathy Clifton that the defendant had purchased a beautiful suit to wear to the funeral. The defendant asked Clifton, "[Y]ou don't think I had anything to do with this, do you?" The defendant also offered to sell the mobile home and land to Clifton. After the murders, but before the funeral, the defendant made a number of statements in Clifton's presence to the effect that the defendant had ample money to pay for the funerals and that she would benefit financially because of the deaths of Julian Lewis and Charles Lewis.

After the murders, the defendant tried to withdraw $50,000 from Julian Lewis' account with Prudential Securities. The defendant appeared at a bank and presented a check, purportedly signed by Julian Lewis and made payable to her in the amount of $50,000. A bank employee refused to negotiate the check because the signature on the check did not match Julian Lewis' signature in the bank's records.

The deputy sheriffs searched a mobile home where Matthew Shallenberger and Rodney Fuller resided. Two shotguns were recovered from the residence and delivered to a forensic

science laboratory for analysis. The shotgun shells recovered from the room where Julian Lewis was murdered were fired by one of the shotguns recovered from the mobile home where Shallenberger and Fuller lived. The deputies also found two pairs of rubber household gloves in a closet in Shallenberger's bedroom. Primer residue caused by the discharge of a firearm bullet or shell was present on the gloves.

Assistant Chief Medical Examiner Susan E. Venuti performed autopsies on the bodies of Julian Lewis and Charles Lewis. She determined that each man died as a direct result of multiple shotgun wounds. Julian Lewis suffered shotgun wounds to the upper left arm, shoulder, abdomen, pelvis, penis, thighs, legs, arms, and chest. The bullets destroyed or removed large areas of tissue in his upper arm, shoulder, and upper chest. The bullets also fractured several ribs. Plastic wadding from a shotgun shell was lodged in his left lung tissue. Julian Lewis eventually died from extensive blood loss.

Charles Lewis received a total of eight wounds from an undetermined number of discharges of a shotgun. He suffered wounds to his back, abdomen, chest, neck, left upper arm and shoulder, elbow, left thigh, face, and forearm.

III.

14

## A.

The defendant argues that "because Virginia has never executed a female who (i) lacks a violent criminal history, (ii) accepted responsibility for her offenses, (iii) merely contracted for the murders giving rise to the offenses, and (iv) observed co-defendants receive life sentences despite their roles as actual triggermen, the circuit court erred by sentencing [her] to death in that such sentence[s] [are] excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." We disagree with the defendant.

Initially, we observe that we do not and cannot consider the defendant's gender in determining whether the sentences of death are excessive and disproportionate when considering both the crime and the defendant. All criminal statutes in this Commonwealth must be applied without regard to gender. Therefore, we decline the defendant's invitation to apply Virginia's capital murder statutes in a discriminatory fashion based upon gender.

## B.

The defendant argues that her sentences are excessive and disproportionate when compared to similar cases. She states that she "did not physically engage in conduct giving rise to the deaths;" rather, she was convicted of capital murder

15

because she was the employer of the men who committed the actual murders. Continuing, she contends there is no reported case in which this Court approved the death penalty for a "mere hirer" due to the vileness predicate alone.

Code § 17.1-313(C)(2) requires that this Court consider and determine "[w]hether the sentence[s] of death [are] excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." Wolfe v. Commonwealth, 265 Va. 193, 226, 576 S.E.2d 471, 490, cert. denied, ___ U.S. ___, 124 S.Ct. 566 (2003) (quoting Hedrick v. Commonwealth, 257 Va. 328, 342, 513 S.E.2d 634, 642, cert. denied, 528 U.S. 952 (1999)); Murphy v. Commonwealth, 246 Va. 136, 145, 431 S.E.2d 48, 54, cert. denied, 510 U.S. 928 (1993).

In conducting this review, this Court considers the records of all capital murder cases reviewed by this Court, including cases in which the defendant received a life sentence. In conducting the proportionality review, it is not the function of this Court to understand why the trier of fact imposed the sentence of life instead of the sentence of death. Rather, "[t]he purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition

16

of the death penalty. We cannot insure complete symmetry among all death penalty cases, but our review does enable us to identify and invalidate a death sentence that is 'excessive or disproportionate to the penalty imposed in similar cases.'" Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000). Simply stated, this Court's proportionality review enables this Court to identify and invalidate the aberrant sentence of death. And, we emphasize that in making the determination whether a sentence of death is aberrant, this Court must consider the penalty imposed in similar cases, considering both the crime and the defendant.

We have examined the records of all capital murder cases reviewed by this Court when, as here, the death penalty was based upon murder for hire. Wolfe, 265 Va. 193, 576 S.E.2d 471; Williams v. Commonwealth, 252 Va. 3, 472 S.E.2d 50, cert. denied, 519 U.S. 998 (1996); Murphy, 246 Va. 136, 431 S.E.2d 48; Fisher v. Commonwealth, 236 Va. 403, 374 S.E.2d 46 (1988), cert. denied, 490 U.S. 1028 (1989); Stockton v. Commonwealth, 227 Va. 124, 314 S.E.2d 371, cert. denied, 469 U.S. 873 (1984); Clark v. Commonwealth, 220 Va. 201, 257 S.E.2d 784 (1979), cert. denied, 444 U.S. 1049 (1980). Even though the facts in all capital murder cases differ, we are confident that given the special heinousness associated with the murder

17

for hire in this particular case, emphasizing that the defendant was the mastermind of the plan to kill her husband and stepson solely for greed and monetary gain, the sentences of death are neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in this Commonwealth for crimes of a similar nature considering the crime and the defendant.

The defendant also argues that her punishment is excessive or disproportionate because her accomplices, Shallenberger and Fuller, did not receive a sentence of death. However, as we have repeatedly stated, "[u]pon our prior determinations of excessiveness and disproportionality, we have rejected efforts by defendants to compare their sentences with those received by confederates."  Murphy, 246 Va. at 145, 431 S.E.2d at 53; Thomas v. Commonwealth, 244 Va. 1, 26, 419 S.E.2d 606, 620, cert. denied, 506 U.S. 958 (1992); King v. Commonwealth, 243 Va. 353, 371, 416 S.E.2d 669, 679, cert. denied, 506 U.S. 957 (1992); Evans v. Commonwealth, 222 Va. 766, 780, 284 S.E.2d 816, 823 (1981), cert. denied, 455 U.S. 1038 (1982), aff'd on remand, 228 Va. 468, 323 S.E.2d 114 (1984), cert. denied, 471 U.S. 1025 (1985).  Accordingly, we reject the defendant's effort to make a similar comparison here.

C.

18

The defendant argues that the circuit court "erroneously imputed the vileness of [the] co-defendants to [her] to determine if [her] conduct satisfied the aggravated battery sub-element [sic] to the vileness predicate."  Continuing, the defendant also argues that the circuit court erred by concluding that her acts reflected a depravity of mind.

Code § 19.2-264.2 states:

> "In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed."

We have stated that "depravity of mind" as used in Code § 19.2-264.2, is "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation."  Stewart v. Commonwealth, 245 Va. 222, 245, 427 S.E.2d 394, 409, cert. denied, 510 U.S. 848 (1993); Thomas, 244 Va. at 25, 419 S.E.2d at 619-20.  We observed in Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S. 1018 (1997) that

19

"[a] finding of 'vileness' must be based on conduct which is 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim.' Code § 19.2-264.2. Proof of any one of these three components will support a finding of vileness. Id.; Mueller v. Commonwealth, 244 Va. 386, 411, 422 S.E.2d 380, 395 (1992), cert. denied, 507 U.S. 1043 . . . (1993)."

Additionally, in Hedrick v. Commonwealth, 257 Va. at 339-40, 513 S.E.2d at 640, we stated that

"a mere inspection of the statutory language in [Code § 19.2-264.2] demonstrates clearly that the term 'vileness' includes three separate and distinct factors, with the proof of any one factor being sufficient to support a finding of vileness and hence a sentence of death. Bunch v. Commonwealth, 225 Va. 423, 442, 304 S.E.2d 271, 282 [1983]. . . . We have also stated that 'Code §§ 19.2-264.2 and -264.4(C) define vileness as conduct that involves torture, depravity of mind, or aggravated battery to the victim; the use of the disjunctive word 'or,' rather than the conjunctive 'and,' signifies the availability of alternative choices.' "

Applying these principles, we need not, and do not, decide whether the circuit court erred in imputing the aggravated battery committed by Fuller and Shallenberger to the defendant. The circuit court held that the defendant's acts were vile because they demonstrated depravity of mind and, without question, the evidence of record is overwhelming that the defendant's conduct showed a depravity of mind.

As we have already stated in Part II of this opinion, the defendant was the mastermind of these gruesome crimes, which would not have occurred but for her actions. The evidence

20

shows that she married her husband because she was interested in his money. She planned to kill him and her stepson so that she could acquire her husband's assets and proceeds from her stepson's life insurance policy. She made a prior unsuccessful attempt along with Shallenberger and Fuller to kill her husband, and, when that plan failed, she initiated another plan which resulted in the deaths of her husband and her stepson while they lay asleep in their home. She involved her 16-year-old daughter in the plan to kill the victims, and she encouraged her daughter to have sexual relations with one of the murderers. The defendant also paid for the shotguns and ammunition used to kill her husband and stepson.

After Shallenberger and Fuller had shot the victims several times with shotguns, the defendant went to her husband's bedroom and took his pants and wallet. She removed cash from her husband's wallet and gave it to the murderers while her husband lay bleeding to death from the wounds that he had suffered. Even then, however, the defendant waited at least 45 minutes, while her husband was still alive suffering and bleeding from the bullet wounds, before she reported the crimes by calling emergency response technicians by telephone. Once the deputy sheriffs arrived at the residence, at least one hour after her husband and stepson had been shot, defendant's husband remained alive, suffering and bleeding to

21

death.   After her husband's death, the defendant showed no emotion or remorse, and she initially denied any involvement in this murder.   Moreover, on the night of the murders, prior to the killings, the defendant prayed with her husband and arranged for her daughter to speak to her husband so that he would not think that something was awry.

Additionally, we observe that the defendant was the wife of one victim and the stepmother of the other victim.   As we have already stated, but for the conduct of this defendant, who was the mastermind of these heinous acts, the killings would not have occurred.   We hold that the evidence sufficiently establishes the defendant's depravity of mind that supports a finding of vileness.

D.

The defendant also claims that the circuit court erroneously sentenced her to death in that "such decision was imposed under the influence of passion, prejudice and other arbitrary factors."   Continuing, the defendant states that her cohorts, "despite being actual triggermen, did not receive death sentences."   Defendant maintains "her sentences of death were influenced by passion, prejudice or other arbitrary factors because (i) evidence indicated that her two co-defendants were more directly culpable in the slayings, (ii) the same Judge sentenced all three defendants, and (iii)

vileness was the only predicate relevant to the death sentence inquiry (and vileness of the crime, of course, applies to all defendants here in that it is the same crime)."  We disagree.

We have reviewed the evidence of record, and we find no evidence that would permit us to conclude that the sentences of death were imposed under the influence of passion, prejudice, and other arbitrary factors.

### E.

We do not consider defendant's assertions that the circuit court erroneously denied her motion to declare Virginia's death penalty statute unconstitutional.  The defendant's sole argument on brief is "[t]he Virginia death penalty statute is unconstitutional for reasons contained in Teresa's Memoranda contained in the Appendix."  The defendant's constitutional arguments were waived by the entry of her guilty pleas.  Murphy, 246 Va. at 141, 431 S.E.2d at 51; Savino v. Commonwealth, 239 Va. 534, 539, 391 S.E.2d 276, 278, cert. denied, 498 U.S. 882 (1990); Stout v. Commonwealth, 237 Va. 126, 131-32, 376 S.E.2d 288, 291, cert. denied, 492 U.S. 925 (1989).

The defendant argues that the circuit court "erroneously sentenced [her] to death because indictments for which death was imposed omitted essential aggravating elements."  We do not consider defendant's assertion.  Defendant failed to

assert this argument in the circuit court and, therefore, she may not assert the argument on appeal.  Rule 5:25.

                              IV.

     We have considered all the defendant's remaining arguments, and they are without merit.  Having reviewed the sentences of death, finding no reversible error in the record, and perceiving no reason to commute the death sentences, we will affirm the judgment of the circuit court.

                                        Affirmed.