COURT OF APPEALS OF VIRGINIA


Present:    Judges Frank, Humphreys and Millette
Argued at Chesapeake, Virginia


STATE WATER CONTROL BOARD
                                                        MEMORANDUM OPINION[*] BY
v.        Record No. 2735-07-1                       JUDGE ROBERT P. FRANK
                                                             AUGUST 5, 2008
CAPTAIN'S COVE UTILITY COMPANY, INC.


                FROM THE CIRCUIT COURT OF ACCOMACK COUNTY
                                Glen A. Tyler, Judge

            Alfred B. Albiston, Assistant Attorney General (Robert F.
            McDonnell, Attorney General; Roger L. Chaffe, Senior Assistant
            Attorney General, on briefs), for appellant.

            Mark R. Baumgartner (Pender & Coward, P.C., on brief), for
            appellee.


        In this appeal, we consider whether the trial court erred in overruling the decision of the

State Water Control Board (Board) and in ordering the Board to issue a Virginia Pollutant

Discharge Elimination System (VPDES) permit to Captain's Cove Utility Company (CCUC).

For the following reasons, we reverse the trial court's order to issue the permit, and we affirm the

Board's decision to deny CCUC's permit application.

                                    BACKGROUND

        CCUC is the entity charged with managing the sewage treatment facility for Captain's

Cove Development, a residential neighborhood comprised of 4,800 lots in Accomack County,

Virginia.  This neighborhood sits at the mouth of the Chincoteague Bay, and a tributary of the

bay, Swan's Gut Creek, runs through the neighborhood.  At the time of the formal hearing on

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

this matter before the administrative hearing officer, the neighborhood contained approximately 710 homes.

The original design of the neighborhood included a small sewage treatment facility intended to service a portion of the existing lots, with the remaining privately-owned lots served by septic tanks. This facility does not discharge into any neighboring state waters and, at the time of the hearing, functioned at approximately one-third of its capacity. Due to later amendments to the county zoning code ordinances, approximately 600 of those lots originally intended to be served by septic tanks were not approved for septic tank permits because the lot size was not sufficient to accommodate a septic field.

CCUC proposed to replace the existing sewage treatment facility with a more advanced biological nutrient removal facility. The new facility would have the capacity to service 2,252 homes in Captain's Cove Development. In order to construct the new sewage treatment facility, CCUC was required to apply to the Board for a VPDES permit, as the effluent from this facility would discharge into Swan's Gut Creek and flow into the Chincoteague Bay.[1]

In reviewing CCUC's permit application and the outfall from its proposed sewage treatment facility, the Department of Health Division of Shellfish Sanitation (DSS) proposed condemning 142.2 acres of the waters of Swan's Gut Creek and Chincoteague Bay.[2] When DSS

---

[1] Code § 62.1-44.19 requires "any owner" seeking to "construct" "a sewerage system or sewage treatment works which will have a potential discharge or actual discharge to state waters" to "file with the [State Water Control] Board an application for a certificate in scope and detail satisfactory to the Board."

While the Board makes the ultimate decision to issue or deny VPDES permits, various state agencies are involved in the decision-making process when the permit has the potential to allow discharges into shellfish growing areas. These agencies include the Department of Environmental Quality, the Department of Health Division of Shellfish Sanitation, and the Virginia Marine Resources Commission. By virtue of their various statutory duties, each agency is charged with individual responsibilities in the collection of information to be considered by the Board in its determination to issue or deny VPDES permits that allow discharge to shellfish growing areas.

[2] In considering condemnation, DSS determines, under federal guidelines established by the National Shellfish Sanitation Program, whether the waters can support shellfish growth free

decides to "condemn" a shellfish growing area, the harvesting of shellfish from this area is not necessarily prohibited; however, before shellfish harvested from this area could be consumed, one would have to obtain a permit from both the Virginia Marine Resources Commission (VMRC) and the Virginia Department of Health certifying that the shellfish have been properly cleansed. Proper cleansing occurs only by two methods: depuration or relaying. Relaying requires shellfish removed from a condemned area to be placed into clean water "for a couple of weeks." Depuration can only be accomplished at a facility designed for this activity; no such facility exists in Virginia.

Throughout the proceedings before the Board, CCUC maintained that the new sewage treatment plant, with its improved technology, would actually improve the waterways around the project by removing existing individual sewer systems, thereby reducing the level of nitrogen released into the groundwater.[3] Additionally, CCUC asserted that, if the permit was denied, a substantial number of residential lots within Captain's Cove Development could not be developed.

Based on DSS's proposed condemnation, the Board conducted a socio-economic public hearing regarding the application on June 21, 2006, pursuant to 9 VAC 25-260-270.[4] Approximately 500 people attended the hearing, with most opposed to the permit. Additionally,

---

from the potential risk of illness from consuming them, based primarily on their proximity to potential factors of pollution, like the sewage treatment facility proposed by CCUC. Thus, a condemned area does not necessarily reflect poor water quality, or a presently harmful level of pollutants in the water. Instead, condemnation only reflects a concern for a *potential, future* harm, for instance, in the case of a natural disaster or a failure in the functioning of the treatment facility.

[3] At the public hearing held by the Board, a representative of CCUC averred that anyone that "has a septic system" in Accomack County was "polluting the bay."

[4] 9 VAC 25-260 requires the Board to convene a public hearing to consider the socio-economic impact of an application for a VPDES permit whenever a proposed discharge, including that of treated waste, would result in the condemnation of shellfish beds by the State Health Department.

the Department of Environmental Quality (DEQ) had received 300 written comments favoring the permit, due largely to concerns about septic fields and wastewater. Another 120 written comments opposed the permit based on the impact upon shellfish and objections to the nutrients that were to be discharged into the water from the facility.

On September 6, 2006, the Board met to consider CCUC's application. CCUC, as well as the various state agencies involved, attended and presented their positions to the Board. DEQ recommended denial of the permit, based on concerns for the protection of water quality and shellfish resources. The Board voted unanimously to deny CCUC a permit.

Subsequently, CCUC petitioned for a formal hearing before an administrative hearing officer to consider its application.[5] The formal hearing took place on May 4, 2007.

The hearing officer heard evidence of conflicting shellfish studies in the proposed condemnation area. The first survey, conducted by CCUC at DEQ's request in August 2005, took a random sampling and concluded that the area "currently supports a modest population of hard clams." The report compared the number of clams collected during the survey to numbers established in Maryland, and concluded that the harvesting of clams from the proposed condemnation area was not "commercially viable" based on Maryland's standards. A VMRC official reviewing CCUC's survey report in November 2005 opined that, while the area did support a known shellfish resource, the condemned area would have "no impact" on the harvesting of shellfish.

---

[5] A formal hearing, authorized by Code § 62.1-44.25, is governed by the Virginia Administrative Process Act and provides "for the formal taking of evidence upon relevant fact issues." Code § 2.2-4020. In all such hearings, the parties are entitled to the representation of counsel, to present "oral and documentary evidence," and to conduct cross-examination of the opposing party's witnesses. Id. "The burden of proof shall be upon the proponent or applicant." Id. "Where a hearing officer presides . . . he shall recommend findings and a decision" to the relevant agency. Id. "The agency shall give deference to findings by the presiding officer explicitly based on the demeanor of the witnesses." Id.

However, in June 2006, another official at VMRC conducted a survey of the shellfish in the proposed condemnation area. Instead of using random sampling, this official accompanied several clam fishermen onboard a fishing vessel, allowing the captain of this vessel "to proceed to those areas [in the proposed condemnation area] which he believed contained the highest densities of hard clams."[6] The numbers of clams harvested on this field trip were significantly larger than those recorded by the CCUC survey. The results of this survey were transmitted to DEQ, with the conclusion that the proposed condemnation area harbored "small areas of commercially viable hard clams" that a fisherman familiar with the area would find "suitable for periodic commercial harvest."[7] Additionally, this official testified at the administrative hearing that the average size of the clams recovered indicated that the clam population in that area was "healthy and reproducing," and could replenish the shellfish beds. He characterized the proposed condemnation area as "densely populated with clams." This official also noted that, in his opinion, "recreational clamming ends when an area is condemned," as those pursuing a recreational harvest will generally not be willing to comply with the stringent guidelines required by the VMRC.

An official from DSS testified that the proposed condemnation area would change the general status of Chincoteague Bay, which was at that time classified as "open, approved and improved" for shellfish harvest. He also noted that the presence of the yellow condemnation signs, required to be posted in any condemned area, could discourage the general public from swimming in the area. This official indicated that there is at least some condemnation of the

---

[6] At the hearing and before the Board, CCUC objected to the method employed by the VMRC survey, asserting that the collection method used by the VMRC official, a hydraulic dredge, was "illegal" in Virginia and artificially inflated the harvest numbers.

[7] This VMRC official testified that his understanding of "commercial viability" in Virginia related to whether those engaged in commercial clamming could harvest enough clams in the area to make a profit.

waters around the discharge point of any sewage treatment facility, regardless of the actual quality of the water itself, simply because of the danger of malfunctions at such facilities.

The engineer who designed the proposed sewage treatment facility for CCUC asserted that the proposal would actually improve the water quality in Chincoteague Bay by incorporating existing individual sewer systems into the facility and by lowering the level of nitrogen reaching the water. Further, the engineer averred that the proposed facility was "one of the strictest in the nation and in Virginia" and that it met all of the required standards of the Clean Water Act, DEQ, and the National Shellfish Sanitation Program.

On cross-examination, the engineer admitted that the nitrogen he attributed to the existing septic systems enters the groundwater, and not the Chincoteague Bay directly, as would the new facility and that there is no way to predict how long it could take that groundwater to enter the bay. He testified that more efficient septic systems are available for pollution removal than those currently in place in Captain's Cove Development. He also noted that nitrogen currently present in the water is not due solely to existing septic systems, as pollution of this sort can be caused by the run-off from agricultural or residential fertilizers. The engineer acknowledged that operating the existing facility, even at full capacity, would not require condemnation of state waters.

A resident of Accomack County testified regarding his recreational use of the proposed condemnation area, noting that he regularly engages in recreational clamming in that area. He stated that between 15 to 25 other boats associated with recreational clamming are generally present on holiday weekends. This resident noted that he personally would not engage in recreational clamming in condemned waters, nor would he swim or allow his grandchildren to swim in those areas. Another local resident testified that he had postponed his submission of applications to lease areas of Swan's Gut Creek in order to raise and farm clams, based on the potential condemnation of the waters if the CCUC permit was issued.

Based on this evidence, on June 29, 2007, the administrative hearing officer concluded that "[r]ecreational uses of the water would be affected by the proposed condemnation," as the "requirements of condemnation" are "evidentiary of prohibitions against recreational use." She stated that, "[s]hellfishing, as a recreational or commercial activity, will end in that area of the bay." As such, she determined that construction of this facility would violate the general water quality standard. The hearing officer also determined that the "[n]ecessity for this outfall [from CCUC's proposed facility] has not been proven by this evidence." The hearing officer noted that the existing sewage treatment facility was not operating at full capacity and that she was not persuaded by CCUC's argument that construction of the new facility would "clean-up" the surrounding waters. The hearing officer recommended that the Board uphold its decision to deny CCUC's application for a VPDES permit.

On July 30, 2007, the Board convened to render a final decision on CCUC's permit application. CCUC and DEQ presented oral argument on their positions. After considering the recommendation of the administrative hearing officer, the evidence before them, and the positions of CCUC and DEQ, the Board decided to deny CCUC's application. The Board agreed with the VMRC official that the proposed condemnation area contained "small areas of commercial viability" and that it could be a source of "periodic commercial harvest." The Board found that

> issuance of a permit would authorize a discharge of a substance –
> effluent from the wastewater treatment plant – which the
> Department of Health has said would require a condemnation of
> waters of the state, thereby causing interference, directly or
> indirectly with a designated use, that use being recreational or
> commercial shellfish harvesting.

In reaching this conclusion, the Board evaluated not only the actual productivity of the shellfish beds, but also the "reasonable potential" of those affected areas. Additionally, the Board stated that relaying was "not a practicable activity." The Board found that the proposed condemnation

- 7 -

area contained "breed stock" clams and that "clam farming activities," "a viable resource" in Virginia, would be "limited or entirely cease" if the permit was issued. The Board concluded that "[u]ses of the water could be affected by the condemnation of this area, by terminating shellfishing by watermen and by individuals who choose to harvest clams in this area." Also, the Board considered the impact that such condemnation would have on swimming in the area, as "it is likely that swimmers would not desire to swim in an area marked with yellow [condemnation] signs."

Accordingly, the Board found that the proposed condemnation of shellfish beds would violate the designated use standards and the general standards contained in 9 VAC 25-260-10 and 9 VAC 25-260-20, respectively. While noting the potential positive impact of the new facility on the 600 lots in Captain's Cove that could not accommodate septic fields, and the possible benefit of converting more of the aqueous nitrogen waste in the new facility, the Board determined that it should deny the permit because of the impact the proposed condemnation area would have on the recreational and commercial uses of the water.

CCUC appealed the Board's decision to the Circuit Court of Accomack County, arguing that (1) the approval of the permit would not result in any violations of the water quality standards, (2) there is no definable standard or criteria justifying denial, and (3) the social and economic benefits of the facility far outweigh the costs.

The trial court heard oral arguments from both parties on August 30, 2007. In its letter opinion dated October 11, 2007, the trial court stated that, while the Board did note that it considered the socio-economic effect of the proposal, the Board "gave the subject of socio-economic effect short shrift." The trial court opined that the competing interests to be weighed by the Board in making its decision were "the rather modest clam resource on one hand and a solution to insidious pollution by groundwater discharge through individual septic tanks in

the subdivision on the other hand." In support of this latter statement, the trial court referenced an article reported on the front page of a local newspaper on October 6, 2007, that discussed "groundwater pollution from failing septic systems." The trial court stated that "[t]he Board did not conclude that future shellfish harvest in the 142 acres outweighed other considerations. They simply found that they gave the matter due legal consideration."

The trial court determined that the Board did not correctly interpret its own regulations. The trial court found that, any time a sewage treatment facility discharges into state waters, DSS must condemn at least some part of that area and that this condemnation would result in an interference with any shellfish harvesting. Thus, the trial court believed that any time a discharge involves state waters with a shellfish population present, the Board, under its present reasoning would deny the permit, regardless of the actual impact on water quality caused by the facility. The trial court held that this standard was inconsistent with the Virginia Supreme Court decision of State Water Control Bd. v. County Utilities Corp., 223 Va. 534, 539, 290 S.E.2d 867, 870 (1982), as CCUC could never comply with the Board's requirements and secure an approval of its permit. In its final order dated November 2, 2007, the trial court ordered the Board to issue the permit.

This appeal follows.

ANALYSIS

On appeal, the Board contends that the trial court erred (1) in finding that the Board did not correctly interpret water quality standards, (2) in finding that the Board did not correctly interpret its regulation referring to "substances attributable to sewage," (3) in holding that the evidence did not support the Board's findings, (4) in holding that the Board did not properly consider the socio-economic effects of the proposed sewage treatment facility, (5) in finding that the Board's decision violated County Utilities, 223 Va. 534, 290 S.E.2d 867, and (6) in directing

the Board to issue the permit as opposed to remanding it for further proceedings.[8]  Essentially,

the Board argues that the trial court did not apply the appropriate standard in reviewing the

Board's decision.

Standard of Review

On appeal of an agency decision, "[t]he sole determination as to factual issues is whether

substantial evidence exists in the agency record to support the agency's decision.  The reviewing

court may reject the agency's findings of fact only if, considering the record as a whole, a

reasonable mind would necessarily come to a different conclusion."  Johnston-Willis, Ltd. v.

Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988).

On appeal of an agency's determination on issues of law, the standards differ.  "'If the

issue falls outside the area generally entrusted to the agency, and is one in which the courts have

special competence, i.e., the common law or constitutional law,'" the court need not defer to the

agency's interpretation.  Id. at 243-44, 369 S.E.2d at 8 (quoting Hi-Craft Clothing Co. v. NLRB,

660 F.2d 910, 914-15 (3d Cir. 1981)).

> However, where the question involves an interpretation which is
> within the specialized competence of the agency and the agency
> has been entrusted with wide discretion by the General Assembly,
> the agency's decision is entitled to special weight in the courts[,
> and] . . . "judicial interference is permissible only for relief against
> the arbitrary or capricious action that constitutes a clear abuse of
> the delegated discretion."

Id. at 244, 369 S.E.2d at 8 (quoting Va. Alcoholic Beverage Control Comm'n v. York St. Inn,

Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979)).[9]

---

[8] Because we find that the trial court erred in failing to accord the proper deference to the Board's decision, we need not consider whether the trial court erred in directing the Board to issue the permit rather than remanding the case to the Board for further proceedings.

[9] We note that this deference applies to the agency's interpretation of its own regulations and, in limited circumstances, to the agency's interpretation of statutes that fall within the specialized competence of the agency.

Under the Virginia Administrative Process Act (VAPA), the trial court reviews the Board's action in a manner "equivalent to an appellate court's role in an appeal from a trial court." J. P. v. Carter, 24 Va. App. 707, 721, 485 S.E.2d 162, 169 (1997) (quoting School Bd. v. Nicely, 12 Va. App. 1051, 1061-62, 408 S.E.2d 545, 551 (1991)). "In this sense, the General Assembly has provided that a circuit court acts as an appellate tribunal." Gordon v. Allen, 24 Va. App. 272, 277, 482 S.E.2d 66, 68 (1997) (citation omitted). Relating to issues on appeal, Code § 2.2-4001 of the VAPA provides, in relevant part, that the party complaining of agency action has the burden to "designate and demonstrate an error of law subject to review by the court."

### The Trial Court's Review of the Board's Decision

With the applicable standard of review in mind, we find that the trial court erred in reversing the Board's decision.

Here, the trial court held that the Board gave the issue of socio-economic impact "short shrift," restated what the trial court believed to be the evidence to be weighed, and then decided to reweigh the evidence, based in part on a newspaper article that was published long after the hearings on this matter were concluded. The trial court concluded that the Board had set an unattainable standard that violated the principles of County Utilities, 223 Va. 534, 290 S.E.2d 867, as it had not allowed CCUC an avenue by which they could construct a sewage treatment facility that would discharge into state waters near the facility.

---

> A principal rule of statutory interpretation is that courts will give statutory language its plain meaning. Only when the statute is obscure or its meaning doubtful will courts defer to an administrative interpretation. In such circumstances . . . courts will generally give great weight to the administrative interpretations of statutory provisions.

Davenport v. Little-Bowser, 269 Va. 546, 555, 611 S.E.2d 366, 371 (2005) (citation omitted).

First, we note that the trial court is not empowered to consider additional evidence that was not before the Board. Under the VAPA, "the factual issues on appeal are controlled solely by the agency record" and the "reviewing court is not free to take additional evidence, even at the request of one of the parties." Nicely, 12 Va. App. at 1061-62, 408 S.E.2d at 551. Thus, we find that the trial court erred in considering the information contained in the newspaper article that discussed the impact of individual septic systems on local pollution. That information was not a part of the agency record, and was not properly before the court.

Further, we hold that the trial court erred in finding that the Board had given the socio-economic issues "short shrift" and in announcing its opinion on the balance of the evidence.

> The circuit court has no authority under VAPA to reweigh the facts in the agency's evidentiary record. VAPA authorizes the court to "reject the agency's findings of fact 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'"

Boone v. Harrison, 52 Va. App. 53, 61-62, 660 S.E.2d 704, 708 (2008) (quoting Mattaponi Indian Tribe v. Dep't of Envtl. Quality ex rel. State Water Control Bd., 43 Va. App. 690, 707, 601 S.E.2d 667, 676 (2004) (emphasis in original), aff'd sub nom., Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality ex rel. State Water Control Bd., 270 Va. 423, 621 S.E.2d 78 (2005)).

> Nor can the court substitute its own judgment for the agency's on matters committed by statute to the agency's discretion. Instead, "when the appellant challenges a judgment call on a topic on which 'the agency has been entrusted with wide discretion by the General Assembly,' we will overturn the decision only if it can be fairly characterized as 'arbitrary or capricious' and thus a 'clear abuse of delegated discretion.'"

Id. at 62, 660 S.E.2d at 708 (quoting Citland, Ltd. v. Commonwealth ex rel. Kilgore, 45 Va. App. 268, 275, 610 S.E.2d 321, 324 (2005)). It is clear from the record that the Board considered all

of the evidence presented on the application, including that presented by CCUC at the various

agency proceedings, and that they weighed this evidence in light of the applicable regulations,

general standards, and the designated uses of state waters.

The regulations promulgated by the Board require that "[w]hen the [B]oard finds that the

proposed project will result in shellfish bed condemnation and if the condemnation will violate

the general standard, it shall disapprove the proposal." 9 VAC 25-260-270. The general

standard, contained in 9 VAC 25-260-20, states:

> State waters, including wetlands, shall be free from substances
> attributable to sewage, industrial waste, or other waste in
> concentrations, amounts or combinations which contravene
> established standards or interfere directly or indirectly with
> designated uses of such water or which are inimical or harmful to
> human, animal, plant, or aquatic life.

The designated uses of the waters are outlined in 9 VAC 25-260-10:

> All state waters, including wetlands, are designated for the
> following uses: recreational uses, e.g., swimming and boating; the
> propagation and growth of a balanced, indigenous population of
> aquatic life, including game fish, which might reasonably be
> expected to inhabit them; wildlife; and the production of edible and
> marketable natural resources, e.g., fish and shellfish.

The legislature has recognized the importance of these standards and designated uses,

noting that:

> It is the policy of the Commonwealth of Virginia and the purpose
> of the [State Water Control Law] to: (1) protect existing high
> quality state waters and restore all other state waters to such
> condition of quality that any such waters will permit all reasonable
> public uses and will support the propagation and growth of all
> aquatic life, including game fish, which might reasonably be
> expected to inhabit them . . . .

Code § 62.1-44.2.

CCUC argues that, because the treated effluent from the proposed facility would not

contravene established water quality standards, the effluent is not a "substance" within the

meaning of 9 VAC 25-260-20 and thus cannot fall within the ambit of that regulation as a violation of the general standard.

This interpretation, however, does not follow from a plain reading of the regulation. "In construing statutes, courts are charged with ascertaining and giving effect to the intent of the legislature." Crown Cent. Petroleum Corp. v. Hill, 254 Va. 88, 91, 488 S.E.2d 345, 346 (1997). "[W]ords and phrases used in a statute should be given their ordinary and usually accepted meaning unless a different intention is fairly manifest." Woolfolk v. Commonwealth, 18 Va. App. 840, 847, 447 S.E.2d 530, 534 (1994). When examining the wording of statutes, this Court prefers to consider the plain meaning of a word rather than an obscure or strained definition. See Rasmussen v. Commonwealth, 31 Va. App. 233, 238, 522 S.E.2d 401, 403 (1999). This Court also avoids interpretations that make a word within a statute meaningless. Gray v. Graves Mt. Lodge, Inc., 26 Va. App. 350, 356, 494 S.E.2d 866, 869 (1998). These principles of statutory interpretation apply with equal force "to the interpretation of regulations adopted by an administrative agency pursuant to statutory authority granted it by the legislature." Avalon Assisted Living Facilities v. Zager, 39 Va. App. 484, 503, 574 S.E.2d 298, 307 (2002).

9 VAC 25-260-20 is written in the disjunctive, prohibiting substances in state waters that either "contravene established standards or interfere directly or indirectly with designated uses of such water." See Gunn v. Commonwealth, 272 Va. 580, 586, 637 S.E.2d 324, 327 (2006) (holding that, where a statute uses the disjunctive "or," the provisions of the statute "plainly encompass two distinct situations"). "'[T]he use of the disjunctive word "or," rather than the conjunctive "and," signifies the availability of alternative choices.'" Lewis v. Commonwealth, 267 Va. 302, 314-15, 593 S.E.2d 220, 227 (2004) (quoting Hedrick v. Commonwealth, 257 Va. 328, 340, 513 S.E.2d 634, 640 (1999)).

Under CCUC's position, adopted by the trial court, a proposed discharge into state waters can only violate the general standard if the discharge itself contains pollutants that contravene established water quality standards. Such an interpretation would render meaningless the word "or" and the language addressing interferences with designated uses, and is contrary to our rules of statutory construction. The regulation clearly contemplates that some substances may not violate water quality standards, while still interfering with designated uses of state waters. Thus, the Board had to consider whether, irrespective of the actual effect the treated effluent would have on water quality, approval of the permit would violate the general standard by interfering with the designated use of state waters.

To that end, the Board convened a socio-economic hearing, pursuant to 9 VAC 25-260-270, to consider the impact of approving or disapproving CCUC's permit application. CCUC participated in a formal hearing, before an administrative hearing officer, where they had the opportunity to present evidence regarding the impact of their permit application. CCUC, as the applicant, bore the burden of proof at this hearing. Code § 2.2-4020.

Based on the factual findings adopted by the Board, it is clear that the Board considered all of the evidence before it. The Board was presented with an application for a VPDES permit from a private corporation, involving a private residential neighborhood, which had an existing sewage treatment facility that did not discharge into state waters and that was operating at 33% of its capacity. The Board considered CCUC's current situation, and the necessity for the construction of a sewage treatment facility of this particular type. The Board had before it the written comments of 300 members of the public who supported CCUC's proposed facility, due largely to concerns about existing septic systems. CCUC presented extensive evidence, at presentations at the public hearings, in oral arguments before the Board, and during the formal

- 15 -

hearing, about the need for this facility to improve the current sewage treatment situation in Captain's Cove Development.

However, the Board also had before it 120 written comments from the public opposed to the construction of the new facility, in addition to over 500 people who attended the public hearings, many of whom voiced opposition to the facility. Public concerns involved the impact on the shellfish population, as well as simply the matter of the discharge itself. At each of the public hearings, the viability of alternative treatment facilities, those that would not require discharge into state waters, were raised by members of the public. DSS representatives testified that much of the concern for public health from the discharge of sewage treatment facilities centered not around the effluent that would normally flow from the facility, but around the inevitable malfunctions and natural disasters that could discharge untreated sewage into state waters. Further, DEQ and an independent administrative hearing officer both recommended denial of CCUC's application for a VPDES permit.

Most notably, the record before us on appeal is devoid of any evidence about the alternatives, or the lack thereof, to constructing a sewage treatment facility that discharges effluent into state waters. The record contains no evidence that discharge into state waters was necessary for CCUC to service the lots in Captain's Cove Development.

That lack of evidence alone distinguishes the instant case from the Supreme Court of Virginia's decision in County Utilities, 223 Va. 534, 290 S.E.2d 867. In that case, the Board adopted a regulation for the acceptable discharge of nutrients into state waters that was at that time, and had always been, "unattainable by any known technology." Id. at 539, 290 S.E.2d at 870. Indeed, the nutrient level required by the regulation was lower than that found in rainwater. Id. The Board had ordered two utility companies to cease discharging effluent into state waters that did not comply with these standards. Id. The subject utility companies challenged the

regulation as being arbitrary and unreasonable, and the Board countered that they were entitled to enact standards that were "unattainable" as long as the companies had the option of connecting to the local municipal sewage treatment facility. Id. The Supreme Court of Virginia held that:

> the legislative intent *governing the Board's authority to establish and enforce standards* was at all times to require that rules be promulgated which are reasonable, practicable of attainment, based upon a fair weighing of the economic and social costs and benefits involved, and of uniform application to all affected parties similarly situated.

Id. at 546, 290 S.E.2d at 874 (emphasis added). The Court then found the Board's actions arbitrary, as they forced the utilities to comply with a water quality standard that was unattainable and unreasonable. Id.

Thus, County Utilities addresses itself to the promulgation of regulations, not individual permit decisions, in announcing its decision that the Board must allow permit holders a reasonable and attainable alternative. The Court in that case judged the Board's action against the statutory limits on the Board's authority to promulgate regulations. Here, we consider only whether the Board's decision to deny CCUC a permit application, a decision falling squarely within the discretion granted to them by the legislature, was arbitrary and capricious.

We can find no authority for the proposition that the Board *must* allow an applicant to discharge into state waters, a premise that seems to be at the heart of CCUC's argument and the trial court's reliance on County Utilities. To the contrary, the legislature has vested the Board with the authority to deny a proposed discharge into state waters altogether. Code § 62.1-44.19 provides, in relevant part: "If the Board disapproves the application [for a permit to discharge into state waters], it shall state what modifications or changes, *if any*, will be required for approval." (Emphasis added). Plainly, the legislature, by including the language "if any,"

- 17 -

contemplated a situation where a permit application could be rejected, with no conceivable modification to that application that would result in approval.

The Board has the statutory authority to prohibit discharges into state water, where such discharge would violate the general standard by interfering with the designated uses of that water. The proposed discharge need not contravene established water quality standards to justify denial, and the Board is not obligated to ensure that the applicant have some avenue to discharge into state water. Guided by these principles, the general standards and the designated uses of state waters, as well as the various agency concerns about the proposed condemnation area, the Board weighed the evidence before them, found the weight of the evidence in favor of denying the permit, and denied CCUC's permit application.

### CONCLUSION

Based on the agency record, we cannot say that the decision to deny CCUC's application for a VPDES permit was unsupported by the evidence, or that the Board's interpretation of its own regulations was arbitrary and capricious. Thus, we find that the trial court erred in reversing the Board's decision and in ordering the Board to issue a permit to CCUC. We reverse the decision of the trial court and affirm the agency's denial of CCUC's permit application.

Reversed.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Humphreys, J., dissenting.

I would refrain from addressing the Board's arguments altogether, because, in my view, they are procedurally waived. Accordingly, I respectfully dissent.

Rule 5A:20(c) clearly requires appellants to provide in their opening brief "[a] statement of the questions presented with a clear and exact reference to the page(s) of the transcript, written statement, record, or appendix, where each question presented was preserved in the trial court." Rule 5A:20(d), in turn, requires appellants to provide "[a] clear and concise statement of the facts that relate to the questions presented, with references to the pages of the transcript, written statement, record, or appendix."

The opening brief filed by the Attorney General fails to comply with either Rule 5A:20(c) or Rule 5A:20(d). First, the opening brief does not specify where in the transcript, joint appendix, or record the Board's questions presented were preserved for appeal. Failure to do so violates Rule 5A:20(c) and is, by itself, grounds for summary affirmance. See Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992) ("We will not search the record for errors in order to interpret the appellant's contention and correct deficiencies in a brief."). To compound the problem, not only did the brief fail to comply with Rule 5A:20(c), but it also failed to include a statement of facts. The section of the opening brief filed by the Attorney General titled "Statement of Facts Related to the Questions Presented" states, in its entirety, as follows:

> The questions presented are essentially issues of law. Certain narrow factual matters relating to interpreting the applicable statutes and regulations, and the issue of practical attainability arising from a comparison with the Commonwealth v. County Utilities, 223 Va. 534, 290 S.E.2d 867 (1982), are included in the arguments addressing those questions, below.

That paragraph does not contain "a clear and concise statement of the facts that relate to the questions presented," as required by Rule 5A:20(d). In fact, the paragraph indicates that the Attorney General deliberately chose *not* to include a statement of facts in the brief.

As is implicit in the majority opinion, and contrary to the assertion in the Attorney General's brief on behalf of the Board, there are a number of factual issues that were resolved by the Board. Those factual issues provide the context for the legal analysis of the circuit court, whose decision we are reviewing on appeal. The failure to provide this Court with the facts that form that context necessarily requires that we search the record for that context, as the majority has done here. However, in the past, we have expected the parties to properly represent the interests of their clients within the traditional adversary system as envisioned by the Rules and have declined repeated invitations to step into the shoes of an advocate by doing a party's job for them and we should not depart from that practice today. See, e.g., Yap v. Commonwealth, 49 Va. App. 622, 629, 643 S.E.2d 523, 526 (2007) ("'Statements unsupported by . . . citations to the record do not merit appellate consideration.'" (quoting Buchanan, 14 Va. App. at 56, 415 S.E.2d at 239)); Fitzgerald v. Bass, 6 Va. App. 38, 56 n.7, 366 S.E.2d 615, 625 n.7 (1988) (*en banc*) ("We do not deem it our function to comb through the record of this . . . trial in order to ferret-out for ourselves the validity of [appellant's] claims."). If a rule of court serves a useful purpose it ought to be enforced.[10] If not, it ought to be repealed. Our rules require that an

---

[10] Indeed, the Supreme Court of Virginia regularly enforces Rule 5:17(c), its equivalent of Rule 5A:20, and clearly regards a failure to adhere to that rule as a waiver of the issue(s). See, Jay v. Commonwealth, 275 Va. 510, 519, 659 S.E.2d 311, 316 (2008) ("When an appellant fails to comply with Rule 5:17(c)(4), this Court generally treats the argument as waived."); Ace Temps., Inc. v. City Council, 274 Va. 461, 465, 649 S.E.2d 688, 690 (2007) (failure to include an assignment of error in a petition for appeal, in violation of Rule 5:17(c), constitutes a waiver of the issue); Martin v. Howard, 273 Va. 722, 727 n.5, 643 S.E.2d 229, 232 n.5 (2007) (failure to identify the "specific errors in the rulings below," in violation of Rule 5:17(c), constitutes a waiver of the issue); Atkins v. Commonwealth, 272 Va. 144, 149, 631 S.E.2d 93, 95 (2006) (failure to brief an assignment of error, in violation of Rule 5:17(c), constitutes a waiver of the issue).

opening brief contain a statement of facts and references to the page in the transcript where the questions presented were preserved. The Board failed to do either.

I also note that, in the many other cases in which the Office of the Attorney General represents the Commonwealth or its administrative agencies, it aggressively urges that we decide cases on procedural default grounds. In many of those cases the errors made by private appellants are far less egregious than the blatant defiance of our rules found in the Board's brief before us today. The British idiom, "What's sauce for the goose is sauce for the gander," seems eminently applicable here. Accordingly, in my view, by ignoring the serious procedural problems with this appeal and addressing the merits of the Board's questions presented, we today create the appearance of a double standard in the application of our rules between private appellants and the Commonwealth.

Given the foregoing, I would treat the issues presented by the Board in this case as waived by virtue of its failure to adhere to Rule 5A:20(c) and (d). See Jay v. Commonwealth, 275 Va. 510, 519, 659 S.E.2d 311, 316 (2008). I would, therefore, decline to address any of the Board's questions presented, and would affirm the judgment of the circuit court.